IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action 13-cv-02927-MSK-MJW

TROY JAMISON KELLY,

Petitioner,

v.

RICK RAEMISCH, *Executive Director of the Colorado Department of Corrections*,
FRANCES FALK, *Warden, Limon Correctional Facility*, and
JOHN SUTHERS, *Attorney General of the State of Colorado*,

Respondents.

---

**REPORT AND RECOMMENDATION
on
PETITION FOR RELIEF PURSUANT TO 28 U.S.C. § 2254
(Docket No. 1)**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This is a habeas case under 18 U.S.C. § 2254.  Petitioner Troy Kelly is serving

life without parole for (among other things) murdering his girlfriend in front of her then-

three-year-old son.  Kelly's petition raises two claims: first, that the jury was given faulty

instructions on intoxication as a criminal defense, and second, that his trial counsel was

constitutionally ineffective by not objecting to the faulty instruction.  Because the

Colorado Court of Appeals reasonably concluded that both claims fail, the Court

recommends that Kelly's petition be denied.

## Colorado Law on Voluntary Intoxication

Colorado's criminal code treats involuntary and voluntary intoxication as two

different things.  The relevant statute states:

> (1) Intoxication of the accused is not a defense to a criminal charge, except as provided in subsection (3) of this section, but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.
>
> . . .
>
> (3) A person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law.

C.R.S. § 18-1-804(1), (3).  Thus, involuntary intoxication is an affirmative defense; self-induced or voluntary intoxication, by contrast, is not an affirmative defense, and evidence of it is admissible only for purpose of negating the government's case as to specific intent.  *See People v. Harlan*, 8 P.3d 448, 470–71 (Colo. 2000), *overturned on other grounds by People v. Miller*, 113 P.3d 743, 748–50 (Colo. 2005).  Evidence of voluntary intoxication is not admissible as to general-intent crimes—i.e., crimes with a *mens rea* of "knowingly" or "willfully," rather than "intentionally" or "with intent."  *People v. Vanrees*, 80 P.3d 840, 846 (Colo. App. 2003), *reversed on other grounds*, 125 P.3d 403 (Colo. 2005); *see also* C.R.S. § 18-1-501(5), (6) (defining specific and general intent).

The distinction between an affirmative defense and evidence negating the government's proof can be difficult to discern.  In fact, through the late 1990s, many Colorado courts did not see the difference and neither did Colorado's model jury instructions.  *See Vanrees*, 80 P.3d at 845–46 (collecting cases).  To end this confusion, the Colorado Supreme Court raised the issue *sua sponte* in *People v.*

*Harlan*, 8 P.3d at 470.  The court considered the following instruction, which was based on the model instructions:

> It is an affirmative defense to the crimes of First Degree Murder after deliberation, First Degree Assault and Attempted First Degree Murder after deliberation that the defendant, because of intoxication, did not have the capacity to form that specific intent required by the statute.

*Id.* at 471–72.  The court held that this jury instruction was wrong for two reasons: first, it described voluntary intoxication as an affirmative defense; second, it instructed the jury to consider intoxication evidence as to the *capacity to form* specific intent, rather than *actual formation of* that intent.  *Id.*

There is one other source of confusion in Colorado's intoxication jury instructions, as it relates to first degree murder: which elements of the crime the evidence is relevant to.  In Colorado, a murder is in the first degree if it is done both "with intent to cause the death" of the victim and also "after deliberation."  C.R.S. § 18-3-102(1)(a).  Some Colorado courts had held that only the "with intent" part was a *mens rea* element and that evidence of voluntary intoxication was thus inadmissible as to the "after deliberation" element.  *See, e.g.*, *People v. Orona*, 907 P.2d 659 (Colo. App. 1995).  In *Harlan*, the Colorado Supreme Court also overturned those holdings.  8 P.3d at 474–75.  The court held that "after deliberation" is part of the crime's *mens rea*, and that intoxication evidence is admissible as to both deliberation and intent.  *Id.*

Despite the Colorado Supreme Court's effort to clarify the law in *Harlan*, incorrect intoxication instructions continue to be given from time to time.  This is at least the fourth case to raise such instructions on habeas review in this Court.

## **Troy Kelly's Case**

The nuances of voluntary intoxication were uniquely important in Kelly's murder trial.  After all, the police found him next to the body, with the murder weapon in hand and an eye-witness in the room; as a practical matter, he couldn't argue that he didn't do it.  He was a severe alcoholic, though, and was unquestionably drunk at the time of the murder.  He therefore lit upon voluntary intoxication as a defense strategy— conceding guilt as to the general-intent crime of second-degree murder and hoping to negate the specific intent for first-degree murder.

Intoxication became the heart of Kelly's defense.  The defense put on evidence of Kelly's extensive personal and family history with alcoholism.  It put on evidence that Kelly had become suicidal and had decided to "drink himself to death."  It put on evidence of the degree of Kelly's intoxication on the night of the murder, and it sponsored expert testimony on the cognitive effects of that level of intoxication.  Defense counsel's *voir dire*, opening statement, and closing argument all focused on the role of intoxication in specific intent.  Defense counsel repeatedly conceded, during closing argument, that Kelly was guilty of second-degree murder.  Raising doubt as to whether Kelly had the capacity to form the *mens rea* for first-degree murder was literally the entire defense strategy.

The standard jury instructions were given at trial: the government's burden of proof, the definition of reasonable doubt, the elements of the crime, the effect of limiting instructions, and so on.  Further, as a first-degree murder case, the jury was given the definitions of "with intent" and "after deliberation":

"After deliberation" is part of the culpable mental state for Murder in the First Degree. It means that the defendant acted not only intentionally, but, also, that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner.

A person acts "intentionally" or "with intent" when his conscious objective is to cause the specific result proscribed by the statute defining the offense. It is immaterial whether or not the result actually occurred.

(Jury Instruction No. 14). None of those instructions were wrong. But after substantial

argument over the holdings of *Harlan*, and over defense counsel's objection,[1] the Court

offered the following instruction on intoxication:

You may consider evidence of the defendant's self-induced intoxication in considering whether the defendant had the capacity to form the specific intent and act after deliberation as required for the crime of MURDER IN THE FIRST DEGREE.

The prosecution has the burden of proving beyond a reasonable doubt that the defendant in fact formed the specific intent and acted after deliberation as required for the crime of MURDER IN THE FIRST DEGREE.

(Jury Instruction No. 15). Kelly's attorney conceded during the pretrial conference that

he didn't fully understand the *Harlan* case—and indeed, this jury instruction was wrong.

To be right, the first paragraph would need to mirror the second, stating "in fact formed"

rather than "had the capacity to form." As written, the instructions arguably imply that

the jury should consider intoxication evidence when finding *capacity to form* intent, but

should put aside all intoxication evidence when finding *actual formation* of intent. It can

---

[1] The trial transcript is not clear as to the basis for defense counsel's objection. The Colorado Court of Appeals held on direct appeal that the error was not preserved, but did not explain the basis for that holding. Nonetheless, Kelly has not argued in this Court (or in state court) that the Colorado Court of Appeals was wrong; indeed, Kelly's *Strickland* claim is premised on that failure to preserve error. Accordingly, any such argument is waived.

be argued that this error lowers the state's burden of proof: the state can overcome the

intoxication evidence by proving simply that Kelly had the capacity to form intent and to

deliberate, rather than that he actually did so; then, with the intoxication evidence out of

the way, the state can proceed to prove intent and deliberation on the rest of the record.

On direct appeal, the Colorado Court of Appeals concluded that the jury

instruction was wrong but not reversible under a plain-error standard of review.  On

state collateral attack, the Colorado Court of Appeals held, further, that the error was

harmless beyond a reasonable doubt.  Both panels came to their conclusions by

viewing the erroneous instruction in light of the full set of jury instructions as well as the

government's closing argument; the second panel also considered defense counsel's

closing argument.

### Federal Habeas Relief

A federal court may grant habeas relief to a state prisoner only if the state court's

adjudication of his constitutional claim was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States."  28 U.S.C. § 2254(d)(1).  The Supreme Court has set forth

standards for applying this statute:

> The statute's "contrary to" and "unreasonable application" clauses
> have independent meaning.  A federal habeas court may issue the writ
> under the "contrary to" clause if the state court applies a rule different from
> the governing law . . ., or if it decides a case differently . . . on a set of
> materially indistinguishable facts.  The court may grant relief under the
> "unreasonable application" clause if the state court correctly identifies the
> governing legal principle . . . but unreasonably applies it to the facts of the
> particular case.  The focus of the latter inquiry is on whether the state
> court's application of clearly established federal law is objectively

> unreasonable[;] an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002).

Further, if the Court finds that the jury instruction violated Kelly's due process rights and the Colorado Court of Appeals unreasonably applied federal law in holding otherwise, the *Brecht v. Abrahamson* harmless-error standard applies. *See* 507 U.S. 619, 623, 629 (1993) (federal court may not grant habeas relief for trial errors without a showing of actual prejudice; error requires reversal only if it "had substantial and injurious effect or influence in determining the jury's verdict"); *Lockett v. Trammel*, 711 F.3d 1218, 1232–35 (10th Cir. 2013) (applying *Brecht* analysis to erroneous jury instruction). This Court applies the *Brecht* standard regardless of whether the state court applied a different standard of harmless error. *Fry v. Pliler*, 551 U.S. 112, 116–20 (2007); *Lott v. Trammel*, 705 F.3d 1167, 1218 (10th Cir. 2013). If the Court finds that Kelly's ineffective assistance of counsel claim has merit, however, the *Brecht* standard does not apply—because it simply repeats the same inquiry already applied in deciding the merits of the ineffective assistance claim. *Byrd v. Workman*, 645 F.3d 1159, 1167 n.9 (10th Cir. 2011).

## <u>Analysis</u>

I.   <u>Kelly's Due Process Claim</u>

Federal habeas relief is available only for violations of federal law; it is thus not available simply because jury instructions misstate a state's criminal law or evidentiary standards. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). Rather, federal habeas relief is available only if the erroneous instruction "'so infected the entire trial that the

resulting conviction violates due process.'" *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  As relevant here, jury instructions violate due process if they relieve the government's burden of proof as to any element of the charged offense.  *E.g.*, *Sandstrom v. Montana*, 442 U.S. 510, 520–21 (1979).  For purposes of this inquiry, "the [faulty] instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record."  *Id.* (quotation marks omitted).  If the jury's charge as a whole is ambiguous, the reviewing court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

There is an extensive body of precedent from the Supreme Court to guide these inquiries.  The most apposite case is *Waddington v. Sarausad*, 555 U.S. 179 (2009).  There, the criminal defendant had been convicted of murder based on accomplice liability.  555 U.S. at 182.  The jury had been correctly instructed as to the accomplice-liability statute—but the correct interpretation of that statute was unsettled, and the prosecutor's closing argument used a hypothetical arguably urging an interpretation of the statute that was later disapproved by the state supreme court.  *Id.* at 184–85.  In analyzing whether there was a reasonable likelihood the jury applied the instruction in a way that violated due process, the Supreme Court relied on three factors.  First, despite his problematic hypothetical, the prosecutor's closing argument asked the jury to find facts establishing the correct legal elements.  *Id.* at 193.  Second, there was strong evidence in the record for those facts.  *Id.* at 193–94.  Third, the jury's behavior—in

convicting some defendants but not others—supported an inference that it understood and applied the correct law.  *Id.* at 194.  Because the Ninth Circuit Court of Appeals had come to the contrary conclusion, the Court then explained where it disagreed with the Ninth Circuit—again looking to the government's closing argument, the weight of the evidence, and inferences drawn from the behavior of the jury.  *Id.* at 194–96.

Other Supreme Court cases look to similar factors.  In *Middleton v. McNeil*, the jury had been given an incorrect instruction on the definition of "imminent peril" as it relates to a self-defense instruction in a murder trial.  541 U.S. 433, 434–35 (2004).  The Supreme Court viewed the one faulty instruction in light of three other instructions on self-defense, all of which were correct, and in light of the government's closing argument applying the correct law.  *Id.* at 438.  In *Estelle*, similarly, the complained-of jury instruction did not warrant habeas relief because there was sufficient evidence supporting conviction under the correct law, 502 U.S. at 73-74, and because the jury instructions as a whole included instructions mitigating the risk of harm from the challenged instruction, *id.* at 75.

Collectively, these Supreme Court cases establish the relevant factors when judging jury instructions "in the context of the instructions as a whole and the trial record" to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violated due process.  *Id.* at 520–21.  The relevant factors are: (1) whether other jury instructions mitigate the harm from the faulty instruction; (2) whether the closing arguments, and in particular the government's closing argument, apply the right law and ask the jury to find facts establishing the

correct legal standards; (3) whether there is substantial evidence in the record for facts satisfying the correct legal standards; and (4) whether the jury's behavior implies that it understood, or misunderstood, the correct legal standards.

Courts have routinely looked to exactly these factors when weighing the due-process harm from Colorado's faulty intoxication instructions.  In *Harlan*, the Colorado Supreme Court found that the jury instruction was wrong—but found the error did not violate due process because the instructions were correct as to the government's burden of proof, there was a second intoxication instruction correctly applying the statute, and defense counsel argued the correct law and facts during closing arguments.  8 P.3d at 472–74 & n.14.  In *People v. Miller*, faulty intoxication instructions did not violate due process because there was overwhelming evidence of the facts needed to satisfy the correct legal standard.  113 P.3d 743, 751–52 (Colo. 2005).  In *People v. Versteeg*, the faulty instruction *did* violate due process—because the prosecutor urged the wrong law upon the jury in closing argument, there was substantial evidence of intoxication, and there was weak evidence of *mens rea*.  165 P.3d 760, 766–68 (Colo. App. 2006).  Further, this Court has applied the same factors in habeas review of faulty intoxication instructions.  In *Carney v. Trani*, Case No. 08-cv-02248-REB, 2011 WL 318694, at *3–4 (D. Colo. Jan. 28, 2011), the Court found no due process violation where there was overwhelming evidence as to facts establishing the correct legal standard; in both *Cooper v. Zavares*, at Case No. 08-cv-02480-MSK, 2010 WL 4449450, *12–13 (D. Colo. Nov. 1, 2010), and *Janoushek v. Watkins*, Case No. 02-cv-00988-REB-MJW, 2007 WL 2316947, at *25–29 (D. Colo. Aug. 9, 2007), the Court

found no due process violation where the faulty intoxication instruction was mitigated by correct statements of law in the jury instructions as a whole and in closing arguments.

All of this tends to show that, if a court reasonably applied the above-listed factors, it has reasonably applied the governing Supreme Court precedent to jury instructions incorrectly stating Colorado's law on intoxication.  Here, the Colorado Court of Appeals applied exactly these factors.[2]  It first noted that the jury instructions correctly and repeatedly put the burden of proof on the government.  It then noted that the government's closing argument applied the correct law, asking the jury to come to findings of fact about Kelly's *actual formation* of intent to kill and *actual* deliberation, even in light of the intoxication evidence—rather than his capacity to do so.  And the factual findings underpinning the court's analysis are not wrong: it is true that the jury instructions put the government to its burden of proof, and it is true that the government's closing arguments asked the jury to apply the correct law and find the correct facts, in light of the evidence of intoxication.

The Colorado Court of Appeals did not apply the other factors—the weight of the evidence as to legally-required but wrongly-instructed facts, and behavior from the jury suggesting a correct or incorrect application of the law—but there is no rule that every factor must be looked at in every case.  Further, the factors do not weigh so heavily in Kelly's favor that it was objectively unreasonable for the Colorado Court of Appeals to

---

[2] The Colorado Court of Appeals did not actually cite Supreme Court precedent; it relied on Colorado Supreme Court cases, which in turn adopted federal standards for due process.  The distinction is not relevant here.  *Bell v. Cone*, 543 U.S. 447, 455 (2005); *cf. Aycox v. Lytle,* 196 F.3d 1174, 1177 (10th Cir.1999) (Under AEDPA, "we owe deference to the state court's *result,* even if its reasoning is not expressly stated.").

ignore them.  The evidence of actual deliberation may not have been overwhelming, but it was also not weak.  Most importantly, Kelly went out of his way to grab a particularly lethal weapon, rather than the nearest sharp or heavy object.  He picked a favorite hunting knife—and to do so, he had to take it not just out of a kitchen drawer, but also out of its original box, in which it was stored.  Further, after the victim called 911, Kelly used that knife to cut the telephone cord.  Finally, Kelly stabbed the victim 17 times, chasing her from room to room to do so.  The state argued that this behavior was powerful evidence of an actual, deliberate decision to kill.  And it is certainly not so weak that the Colorado Court of Appeals acted unreasonably in omitting the weight of the evidence from its due process analysis.  Similarly, there is no indication that the jury asked for further clarification on intoxication; the jury asked to re-hear the testimony of two officers, and for clarification on the verdict form, but these questions do not obviously support any inference as to how the jury applied the intoxication instruction.

The Colorado Court of Appeals applied the right Supreme Court precedents, looked to the right factors for applying those precedents, and made reasonable findings of fact in weighing those factors.  Thus, the Colorado Court of Appeals reasonably applied federal law to Kelly's due process claim.  The undersigned therefore recommends that Kelly's first claim for relief be denied.

II.    Kelly's Ineffective Assistance of Counsel Claim

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Kelly has a constitutional right not simply to have counsel, but to have effective counsel.  To show a violation of that right, Kelly must show both that his counsel's performance "fell below an

objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Id.* at 687–88. Courts are free to address these two prongs in any order, and failure under either is dispositive. *Id.* at 697.

Kelly argues that his trial counsel was deficient because he did not object to the faulty jury instruction on intoxication. Kelly further argues that this failure prejudiced his defense because it led to the faulty instruction being reviewed on appeal under a plain-error standard, rather than the more forgiving harmless-error standard that would have applied to a properly preserved error.[3] The Colorado Court of Appeals resolved this *Strickland* claim on the prejudice prong. It held that the faulty instruction was harmless beyond a reasonable doubt—the very standard Kelly argues would have been applied on direct appeal if his trial counsel had been effective. Although the court did not make its reasoning explicit, it ended its *Strickland* analysis there, thus impliedly holding that Kelly's attorney's failure to object to the intoxication instruction caused no prejudice to Kelly because his appeal would have lost anyway.

The Colorado Court of Appeals reasonably applied Supreme Court precedent. It correctly applied the disjunctive test of *Strickland*, and correctly resolved the case on one prong. In testing Kelly's theory of prejudice, it correctly applied a beyond-a-reasonable-doubt standard for harmless error, as required by *Chapman v. California*, 386 U.S. 18 (1967). In holding that the error was harmless beyond a reasonable doubt,

---

[3] It's worth noting that the federal Courts of Appeals are split on whether this is a cognizable *Strickland* claim. *See Henh Chu Ngo v. Holloway*, 551 F. App'x 713, 718 n.2 (4th Cir. 2014) (recognizing circuit split and collecting cases). The Tenth Circuit has apparently not weighed in, but it makes no difference here—because the Colorado Court of Appeals' decision stands, either way.

the court found that the jury instructions as a whole held the government to its correct burden of proof on *mens rea*, and that the government's closing argument emphasized evidence of actual intent and deliberation even in light of the intoxication evidence— correctly asking the jury to find both that Kelly *could*, and that Kelly *did*, deliberate and form the intent to kill.

The court's harmless-error analysis could have been more thorough.  The issue of intoxication negating specific intent was literally the only disputed issue in the case; thus, any error went to the very heart of the defense strategy.  Also, the court's jury-instruction discussion did not include any discussion of the weight of the evidence.  But even so, the factors the court did analyze weigh strongly in favor of finding harmless error.  In relying on those factors, the court's analysis was not objectively unreasonable. *Cf. Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")  The undersigned therefore recommends that Kelly's second claim for relief be denied.

## **Recommendation**

For the foregoing reasons, it is hereby RECOMMENDED that the Petition for Relief Pursuant to 28 U.S.C. § 2254 (Docket No. 1) be DENIED.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions. <u>Makin v. Colo. Dep't of Corr.</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated: October 21, 2014           <u>*/s/ Michael J. Watanabe*</u>
      Denver, Colorado          Michael J. Watanabe
                                United States Magistrate Judge

Appendix 1

Colorado Court of Appeals Decision on Post-conviction Relief



10CA1323 Peo v. Kelly 09-13-2012

COLORADO COURT OF APPEALS

CRKLF

---

Court of Appeals No. 10CA1323
Arapahoe County District Court No. 00CR1636
Honorable Elizabeth A. Weishaupl, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Troy Jamison Kelly,

Defendant-Appellant.

---

ORDER AFFIRMED

Division III
Opinion by JUDGE ROY
Dailey and Richman, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(f)**
Announced September 13, 2012

---

John W. Suthers, Attorney General, Melissa D. Allen, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Law Firm of Richard A. Hostetler, Richard A. Hostetler, Denver, Colorado, for
Defendant-Appellant

Troy Jamison Kelly, defendant, appeals the trial court's summary denial of his Crim. P. 35(c) motion for postconviction relief alleging ineffective assistance of counsel. We affirm.

## I. Background

Defendant, the victim, and the victim's young child, lived together. The relationship between defendant and the victim deteriorated due, in part, to defendant's alcohol problem. On the night in question, an emergency dispatcher received a call from the residence, heard the victim pleading for her life and a scuffle, and then the phone went dead and there was no response to a call back. The police were dispatched to the residence and discovered the victim lying dead on the floor from multiple stab wounds. Defendant was also lying on the floor on his back. When the officers ordered him to get up he rose with a large hunting knife in one hand and threatened the officers, who then shot him six times. The child was in the room and when found, exclaimed that defendant had killed the victim.

Defendant was charged with first degree murder after deliberation, two counts of first degree assault as to the police

1

officers, wiretapping, child abuse resulting in injury, and two counts of mandatory crime of violence sentencing.  Defendant asserted that he was not capable of forming, and did not form, the specific intent and deliberative mental state required for first degree murder because he was voluntarily intoxicated.

The jury found defendant guilty of first degree murder, two counts of felony menacing, wiretapping, and child abuse.  His convictions were upheld by a division of this court on direct appeal. *People v. Kelly*, (Colo. App. No. 02CA1839, Dec. 29, 2005) (not published pursuant to C.A.R. 35(f)) (*Kelly I*).

Defendant then filed a Crim. P. 35(c) motion for postconviction relief alleging that his trial counsel was ineffective because he failed to (1) object to the voluntary intoxication instruction, which resulted in a less favorable standard of review on direct appeal; (2) investigate, research, and properly present the defense of voluntary intoxication and other possible defenses; (3) investigate and present a heat of passion theory of defense (4) properly advise defendant of the necessity of his testimony with regard to a heat of passion defense, which deprived defendant of the ability to make an

2

informed decision on whether or not to testify; (5) investigate and present evidence that would have contradicted the prosecution's "bad act" evidence; and (6) fully and completely investigate and present evidence contradicting the prosecution's theory regarding defendant's motive and his relationship with the victim.[1]

Following the prosecution's response to defendant's motion, the trial court denied the motion without a hearing or appointment of counsel. The court concluded that even if trial counsel had objected to the voluntary intoxication instruction and the *Kelly I* division had reviewed the matter for harmless error rather than plain error, it was unlikely that the outcome of the appeal would have been different. As to defendant's other ineffective assistance of counsel claims, the trial court determined that defendant had failed

---

[1] In addition to his ineffective assistance of trial counsel claims, defendant also argued that the improper voluntary intoxication instruction lessened the prosecution's burden in violation of his federal and state rights to due process of law. However, on appeal defendant has not presented any argument or authority pertinent to this claim and, therefore, it has been abandoned. *See People v. Rodriguez*, 914 P.2d 230, 249 (Colo. 1996) (defendant's failure to reassert on appeal the claims disposed of by the district court constitutes a conscious relinquishment of those claims).

to allege sufficient facts which, if true, would support the conclusion that trial counsel had been ineffective or that defendant had been prejudiced.

## II. Ineffective Assistance of Trial Counsel

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *People v. Valdez*, 178 P.3d 1269, 1278 (Colo. App. 2007). Thus, we defer to the postconviction court's findings of fact so long as they are supported by the record, and we review its legal conclusions de novo. *Carmichael v. People*, 206 P.3d 800, 807-08 (Colo. 2009).

To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was constitutionally deficient; and (2) the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 688-89, 104 S.Ct. 2052, 2065 (1984).

The proper inquiry with regard to constitutional deficiency is whether, considering the totality of the circumstances, the lawyer's assistance was reasonable under prevailing professional norms. *People v. Walton*, 167 P.3d 163, 167 (Colo. App. 2007). To establish

4

deficient performance resulting in prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 168.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. That standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct 1388, 1403 (2011) (citing *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 791 (2011)).

A criminal defendant must prove both prongs of the *Strickland* test in order to succeed on an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

### III. Instruction on Voluntary Intoxication

In a unique argument, defendant asserts that trial counsel was ineffective in proffering an incorrect jury instruction regarding his defense of voluntary intoxication. Because the division in *Kelly I* rejected invited error and addressed the merits, his argument here is couched in terms of trial counsel's failure to object to the

incorrect jury instruction, which, in turn, impacted the standard of review on appeal to his disadvantage.

At trial, defendant offered, and the trial court delivered, the following voluntary intoxication instruction:

> You may consider evidence of the defendant's self-induced intoxication in considering whether defendant had the capacity to form the specific intent and act after deliberation as required for the crime of [murder in the first degree].[2]

On direct appeal, defendant raised the "*Harlan* objection," arguing that the instruction lowered the prosecution's burden of proof because it improperly limited the jury's consideration of voluntary intoxication evidence to whether defendant had the capacity to form, as opposed to whether he did in fact form, the requisite culpable mental state. Because the division concluded that defense counsel had proffered the jury instruction out of ignorance,

---

[2] The proper instruction would state: "If you find that the defendant was intoxicated to such a degree that he did not form the intent or that he did not deliberate, both of which are required elements of [the crime], [you] should find the defendant not guilty of that charge." *People v. Miller*, 113 P.3d 743, 751 (Colo. 2005).

inadvertence, or negligence, it did not treat the proffered instruction as invited error[3] but, instead, reviewed for plain error.

Plain error review addresses error that is both plain and obvious and requires reversal when the appellate court can state with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *See People v. Miller,* 113 P.3d 743, 750 (Colo. 2005). The *Kelly I* division concluded that, although the instruction was improper under *People v. Harlan*, 8 P.3d 448 (Colo. 2000), *overruled by Miller,* 113 P.3d at 749, the error in giving it to the jury did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.

In *Harlan*, the defendant, having preserved the issue in the trial court, argued on appeal that an improper instruction on voluntary intoxication — similar to the one given here — lowered

---

[3] "Under the doctrine of invited error, . . . a party may not complain if he has been the instrument for injecting error into the case, such as by tendering an erroneous jury instruction." *People v. Duran, -* 272 P.3d 1084, 1095-96 (Colo. App. 2011). Therefore, the appellate court will not consider the asserted error.

the prosecution's burden of proof and, therefore, denied him due process of law.  The supreme court agreed and reviewed the issue under the constitutional harmless error standard, which requires reversal unless the appellate court can declare a belief that the error did not contribute to the conviction beyond a reasonable doubt.  *Harlan*, 8 P.3d at 472 (citing *People v. Dunlap*, 975 P.2d 723, 737 (Colo. 1999)).  It concluded, after considering all of the instructions as a whole, that the error did not rise to constitutional harmless error.[4]

Therefore, so goes the argument, had defendant's counsel preserved the instructional error, the standard of review on direct appeal would have been whether the error did not contribute to the conviction beyond a reasonable doubt.  Because the error was treated as an unpreserved error on direct appeal, the standard of review was whether the error so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the

---

[4] To complete the trilogy, the harmless error standard of review is for a preserved error which does not rise to a constitutional dimension, and states that the error is harmless unless there is a reasonable probability that it contributed to the defendant's conviction. *People v. Rincon,* 140 P.3d 976, 980 (Colo. App. 2005).

8

judgment of conviction, the plain error analysis.  Defendant contends that the threshold for constitutional harmless error was lower than that for plain error and may have mandated a favorable outcome on appeal.

At the outset, the fact that the division on direct appeal concluded that the error did not rise to plain error does not preclude a conclusion that it is also harmless beyond a reasonable doubt.  The distinction between plain error, harmless error, and error which is harmless beyond a reasonable doubt, is not of mathematical exactitude.  Both "plain error" and "harmless beyond a reasonable doubt" with respect to errors in the jury instructions are subject to the same analysis, that is, the consideration of the instructions as a whole.  *Miller,* 113 P.3d at 750 (plain error); *Harlan,* 8 P.3d at 472 (harmless beyond a reasonable doubt).

The jury was also instructed:

> "After deliberation" is part of the culpable mental state for Murder in the First degree.  It means that the defendant acted not only intentionally, but, also, that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act.  An act committed after deliberation is

9

> never one which has been committed in a
> hasty or impulsive manner.
>
> A person acts "intentionally" or "with intent"
> when his conscious objective is to cause the
> specific result proscribed by the statute
> defining the offense.  It is immaterial whether
> or not the result actually occurred.

The jury was further instructed on at least two occasions that first degree murder requires, and the prosecution must prove beyond a reasonable doubt, that the defendant acted both with intent and after deliberation.

In addition, during closing arguments, the prosecutor — while challenging the accuracy to the blood alcohol evidence — argued that defendant had in fact formed the requisite culpable mental state despite his intoxication.  The prosecutor encouraged the jury to use the intoxication evidence in determining whether defendant actually formed the requisite culpable mental state.  Further, defendant's closing argument also discussed the evidence of intoxication with respect to whether defendant had in fact formed the culpable mental state for first degree murder.

Therefore, we conclude that the error in giving the instruction was harmless beyond a reasonable doubt.  *Harlan*, 8 P.3d at 472.

10

IV. Inadequate Investigation Claims

Defendant also contends that the trial court erred in dismissing his remaining claims on the grounds that they were unsupported and baseless. We disagree.

A trial court may deny a defendant's motion without a hearing if the motion, the files, and the record establish "that the defendant's allegations, even if proven true, would fail to establish one or the other prong of the *Strickland* test." *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003); *see also People v. DiGuglielmo*, 33 P.3d 1248, 1251 (Colo. App. 2001).

A Crim. P. 35(c) motion is also properly denied if the claims raise only issues of law, or if they are "bare and conclusory in nature, and lack supporting factual allegations." *People v. Venzor*, 121 P.3d 260, 262 (Colo. App. 2005).

A. Inadequate Investigation – Voluntary Intoxication Defense

Defendant argues that trial counsel was ineffective for failing to properly investigate and present evidence of voluntary intoxication to challenge the culpable mental state for after deliberation first degree murder. Specifically, defendant faults trial

11

counsel for (1) failing to test the blood samples — taken from defendant on the day he was arrested — until shortly before trial, which made the results subject to question; (2) retaining the toxicology expert only one day before he testified; and (3) eliciting the wrong testimony from the toxicology expert. We conclude that defendant has failed to demonstrate that counsel's performance was constitutionally deficient.

Defendant's toxicology expert testified that, based on two blood samples taken from defendant the night of his arrest, defendant's blood alcohol level shortly after his arrest was between .316 and .273 grams of ethyl alcohol per hundred milliliters (3.16% and 2.73%). In addition, the expert relied on a urine sample collected approximately twelve hours later.

However, the blood samples were not analyzed until over two years later and shortly prior to trial. Despite the delay in testing, the expert opined that he had a high level of confidence in the result and that, if anything, the result was lower than defendant's actual blood alcohol on day in question. The expert further testified that at this level of blood alcohol, the person would be operating at the

12

emotional level or very basic level, and not as a thinking, reasoning, functioning individual.  After hearing the elements of after deliberation first degree murder, the expert testified: "My opinion [is] that Mr. Kelly or any individual at .25 and above is severely, mentally impaired by the alcohol and not capable of a good reflection and essentially judgment, is not capable of normal judgment," and "[M]y opinion from the literature, there is no question that a .25 and above, all individuals have lost judgment." [sic]

The cross-examination of defendant's expert focused on the health department regulations governing the collection of blood samples used to determine the blood alcohol levels in driving offense cases.  Defendant's samples were collected for treatment purposes and did not comply with the collection and storage regulations of the department of health.  For instance, the regulations require that a cleaning fluid other than ethyl alcohol be used to cleanse the skin prior to inserting the collection needle and that the collecting vials contain preservatives to prevent deterioration of the blood, which, in some cases, could increase the

13

blood alcohol level.  The impact of a different cleaning fluid could not be corrected, but the impact of a different preservative might have been ameliorated by earlier testing.

On cross-examination, defendant's expert testified that he could not form an opinion to the requisite certainty as to defendant's blood alcohol level based on the two blood samples only.  However, on direct and redirect, he testified that his opinion was to the requisite certainty because he used two blood samples and the urine sample, which verified the results reached from the blood samples.  Defendant's expert further testified that the health department regulations were not applicable here.

The prosecution's expert, who was well qualified and was employed in the pathology laboratory of a hospital testing the blood in corpses, refused to express an opinion as to defendant's blood alcohol levels, taking the position that the techniques used by defendant's expert had no support in the literature.

While counsel's investigation may have been late and appears to have been hurried, we cannot say based on this record that it was inadequate.  Certainly the investigation was sufficient to

14

launch an adequate challenge as to defendant's capacity to form, and form, the requisite culpable mental state for after deliberation first degree murder. Therefore, defendant has not convinced us that counsel's performance in this regard was deficient.

### B. Inadequate Investigation – Remaining Claims

Defendant's remaining claims allege trial counsel's failure to investigate. Defendant contends that trial counsel failed to investigate a heat of passion defense and, therefore, failed to adequately advise defendant about his right to testify in support of that defense. He also contends that counsel failed to discover evidence or witnesses to rebut the prosecution's evidence regarding his prior bad acts, his relationship with the victim, and his alleged motive.

These remaining claims are devoid of any supporting detail. Defendant does not indicate what witnesses defense counsel could have discovered or what they would have testified to that could have changed the outcome of the proceedings. Nor did he allege what evidence trial counsel could have discovered. Thus, he has again failed to meet his burden.

15

In addition, we agree with the trial court that defendant's claim regarding advisement on the right to testify concerning a heat of passion defense necessarily assumes that he had a viable heat of passion defense.  Because we have concluded that defendant has failed to adequately plead that claim, we also reject his contention that counsel was deficient with respect to such an advisement.

The order denying defendant's Crim. P. 35(c) motion without a hearing is affirmed.

JUDGE DAILEY and JUDGE RICHMAN concur.

Appendix 2

Colorado Court of Appeals Decision on Direct Appeal



People v. Kelly, T

COLORADO COURT OF APPEALS

---

Court of Appeals No.: 02CA1839
Arapahoe County District Court No. 00CR1636
Honorable James F. Macrum, Jr., Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Troy Jamison Kelly,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by: JUDGE ROY
Carparelli and Russel, JJ., concur

Opinion Modified, and As Modified,
Petition for Rehearing <u>DENIED</u>

**NOT PUBLISHED PURSUANT TO C.A.R. 35(f)**
Announced: December 29, 2005

---

John W. Suthers, Attorney General, Melissa D. Allen, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Law Firm of Richard A. Hostetler, Richard A. Hostetler, Denver, Colorado, for
Defendant-Appellant

OPINION is modified as follows:

**Page 10, line 14 currently reads:**

See People v. Sharp, ___ P.3d ___ (Colo. App. No. 04CA0619, Nov. 3, 2005).

**Opinion is modified to read:**

See People v. Vigil, 127 P.3d 916 (Colo. 2006)(approving the formulation of the

objective witness test as stated in People v. Sharp, ___ P.3d ___ (Colo. App. No.

04CA0619, Nov. 3, 2005), whose factors include age, awareness of government

involvement, and awareness of the possibility of criminal punishment of a

defendant).

Defendant, Troy Jamison Kelly, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree murder, two counts of felony menacing, wiretapping prohibited, and child abuse.  We affirm.

Defendant met the victim in the fall of 1997, just after the victim had given birth to her first child (the son).  Despite the instability of their relationship due to defendant's drinking, they moved into an apartment together in June 2000.  The relationship then deteriorated to the point that the victim wanted to move out.

In the middle of July 2000, defendant agreed to allow the victim to move out of the apartment.  However, on July 16, 2000, the Greenwood Village Police Department received a 911 call from the apartment.  When the operator answered the call there was no response on the other end of the line, but the operator could clearly hear a female voice begging not to be killed and sounds of a struggle.  The line went dead shortly after the phone call was originated, and there was no answer when the operator called the number back.

1

The operator dispatched an officer in the vicinity and indicated that there had been a hang-up call with a female in distress. Two other officers also responded.

As the three officers approached the apartment, they were advised by a fellow officer that he had been at the address three weeks before in response to an alcohol-related incident and that there was a registered sex offender at the address. The officers pounded on the door and identified themselves, but did not receive a response. One of the officers then looked into the windows of the apartment to no avail.

The officers heard a dog barking from inside the apartment, which stopped suddenly as though someone had restrained the dog. When there was still no response to the officers' calls, two of the officers opened a slightly cracked window and climbed inside. They then opened the door from the inside for the other officer. The three officers proceeded to the back of the apartment where they discovered defendant lying on the floor and breathing heavily. They also saw the victim lying on her back with multiple stab wounds, including a deep cut to the throat.

One of the officers yelled at defendant, asking what had happened, but received no response. The officer then noticed movement from the bunk bed in the room. The son pushed himself up and said, "He said he killed my mommy. Daddy killed my mommy." The officer picked up the son and removed him from the apartment.

In response to an order that he show his hands, defendant sat up and faced the officers, holding a large knife. After failing to obey several orders to drop the knife, defendant started to raise the knife above his shoulders as if preparing to attack, and the officers shot him six times.

Defendant was taken to a hospital to be treated for his wounds. Subsequently blood samples for treatment purposes were taken from defendant at the hospital, which indicated that defendant's blood alcohol level was at least 0.26 at the time the incident occurred.

Defendant was charged with first degree murder after deliberation, two counts of first degree assault, wiretapping prohibited, child abuse resulting in injury, and two counts of mandatory sentencing for crimes of violence. After a jury trial,

3

defendant was found guilty of first degree murder, two counts of felony menacing, wiretapping prohibited, and child abuse. This appeal followed.

I.

Defendant first contends that the trial court erred in denying his motion to suppress evidence found in his home after the officers entered the home without a warrant. We disagree.

In reviewing a suppression ruling, we defer to the trial court's findings of fact, which we will not overturn unless the ruling is not supported by the record. However, we apply de novo review in assessing the trial court's legal conclusions. People v. Cruse, 58 P.3d 1114 (Colo. App. 2002).

An emergency safety or life threatening circumstance is an exception to the search warrant requirement. For the emergency aid exception to be applicable, there must be an immediate crisis and the probability that assistance will be helpful. People v. Amato, 193 Colo. 57, 562 P.2d 422 (1977).

To determine whether the prosecution has proved that the warrantless entry was justified by the emergency aid exception, a court must "examine the totality of the circumstances as they

4

would have appeared to a 'prudent and trained police officer' at the time the decision to conduct the warrantless search is made."
People v. Smith, 40 P.3d 1287, 1290 (Colo. 2002) (quoting People v. Malczewski, 744 P.2d 62, 66 (Colo. 1987)).

Here, the trial court found that when the officers entered the apartment they were aware that (1) a 911 call had been placed from that address; (2) the female caller appeared to be in distress, and someone other than the caller was present; (3) there was no answer when the operator called back; (4) authorities had recently been dispatched to the apartment in response to an alcohol-related call; (5) there previously had been a registered sex offender at the address; (6) a barking dog had apparently been silenced by someone in the apartment; (7) there was no response to repeated knocks on the door and communications from police; and (8) at least one of the officers felt from his experience in the field that something was wrong.

We agree with the trial court that a reasonable and prudent officer would have believed there was an immediate crisis with respect to which he or she could likely have rendered assistance.

Therefore, the trial court properly rejected defendant's motion to suppress.

### II.

Defendant next contends that the trial court violated the Confrontation Clauses, U.S. Const. amends. VI, XIV; Colo. Const. art. II, §§ 16, 25, by admitting statements made by the son and the victim. We disagree.

At the outset, we note that defendant argues that many other hearsay statements made by the victim and admitted at trial violated his Confrontation Clause rights. However, defendant concedes that if nontestimonial statements fall outside the federal Confrontation Clause, as our supreme court recently ruled in Compan v. People, 121 P.3d 876 (Colo. 2005), those statements were admissible.

### A.

Defendant first argues that the trial court erred in admitting nontestimonial statements made by the son and the victim in violation of his federal right to confront witnesses against him. We disagree.

A defendant has a constitutional right to cross-examine a witness about testimonial statements.  U.S. Const. amends. VI, XIV; Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  However, where statements are nontestimonial, no right to confrontation exists.  Compan v. People, supra.

Though the phrase "testimonial statements" has not been precisely defined, the Supreme Court has held that at a minimum statements given "at a preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations" are testimonial. Crawford v. Washington, supra, 541 U.S. at 68, 124 S.Ct. at 1374.

Statements that might qualify as testimonial include "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."  Crawford v. Washington, supra, 541 U.S. at 51, 124 S.Ct. at 1364.

The Tenth Circuit has interpreted the Crawford v. Washington formulation to mean that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that

his statement might be used in the investigation or prosecution of the crime." United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005).

We are aware that in United States v. Solomon, 399 F.3d 1231 (10th Cir. 2005), the court held that when, as here, the confrontation issue was not preserved in the trial court and the defendant does not argue plain error on appeal, the appellate court may decline to address it. However, we choose to address the issues here under the plain error standard of review.

The plain error analysis requires that the appellate court first determine whether the error was "plain" or " obvious," and, if so, whether, after reviewing the entire record, the court can say with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. See People v. Miller, 113 P.3d 743, 749 (Colo. 2005).

1.

Defendant first contends that several out-of-court statements made by the son to police officers in the apartment, police officers at the police station the night of the murder, his forensic

8

interviewer, his therapist, and family members that were subsequently admitted at trial were testimonial and violated defendant's rights under the Sixth and Fourteenth Amendments. We disagree.

The statements at issue include the son's frantic statements made to police officers when they first entered the apartment that "He said he killed my mommy," and "Daddy killed my mommy."

The statements at issue also included those made by the son after he was removed from the crime scene and taken to a children's advocacy center to be interviewed by a forensic interviewer.  There, the son told the interviewer that he did not have a mother, that "she's all killed," and "my damn dad scraped my mom with the sharp knife, and they're all dead."

In addition, the statements at issue included those made by the son to a detective who specialized in interviewing children, in which the son said that his father had killed his mother.

Further, the statements at issue included those made by the son during two of twenty-two counseling sessions with his therapist.  In these sessions, the son painted pictures of his mother

"with a cut under her chin" and told his therapist, "I told [defendant] not to kill my mommy, and he did anyway."

And finally, the statements at issue included those made by the son to his aunts, father, and stepmother. The family members were instructed to write down any spontaneous statements of the son made regarding the victim's death. These statements, of which there were many, are summarized by his statement to his aunt, "When my mom's done being killed up, I'm going to talk to her," and a statement to stepmother, "[Defendant] killed my mom with a sharp knife."

The statements made by a three-year-old child cannot be said to be testimonial as a child of that age cannot be expected to foresee that his or her statements would be used in a prosecutorial setting. Therefore, they were nontestimonial. See People v. Vigil, 127 P.3d 916 (Colo. 2006)(approving the formulation of the objective witness test as stated in People v. Sharp, ___ P.3d ___ (Colo. App. No. 04CA0619, Nov. 3, 2005), whose factors include age, awareness of government involvement, and awareness of the possibility of criminal punishment of a defendant).

However, even if we were to construe these statements as testimonial, no plain error exists because the identity of defendant as the killer was not in dispute. The contested issue was whether defendant had the requisite culpable mental state, specific intent; and the son's statements did not address his state of mind. The only charge to which the son's statements pertained was child abuse, and defendant's counsel conceded in closing arguments that the jury should find defendant guilty on that count.

Therefore, admission of the son's statements did not undermine the fundamental fairness of defendant's trial, and, even if it was error to admit them, reversal is not required.

2.

Defendant also contends that the victim's conversation with the emergency dispatcher was testimonial and its admission violated his rights under the Confrontation Clause. We disagree.

At trial, the jury heard a tape of the emergency call the victim placed while she was being attacked by defendant. The call consisted of the following:

> Dispatcher:  Greenwood Village  911, what's your emergency . . . Hello?

11

Victim:  Don't [defendant].  No, I'm innocent.
Please, please, please, just don't.

Dispatcher:  Hello?

Victim:  Don't kill me, please don't.  No, I'm
innocent.

Dispatcher:  Ma'am, hello?

Victim:  (muffled/unintelligible)  Don't, don't,
don't (child crying, screaming in background)
Don't, I don't care, I don't want him to see.
Don't, don't (crying in background).  Ahhh
(loud "pop").  Get out of this room (child
screaming – word unintelligible)
. . . .

Victim:  Help! Help!

Son:  Momma!

Victim:  Ahhhh!

Dispatcher:  Ma'am?

Victim:  Ahhhh!

Son:  (unintelligible screaming and crying).

Victim:  Help!

At the outset, this is not a conversation between the
dispatcher and the victim.  Rather, it can be best characterized as
the dispatcher listening to the victim while attempting to engage the
victim in conversation.  Under these circumstances, no reasonable

12

person in the victim's apparent situation would objectively foresee that his or her statements might be used in the prosecution of the crime.  See also People v. Moscat, 3 Misc. 3d 739, 777 N.Y.S.2d 875 (N.Y. City Crim. Ct. 2004)(applying Crawford and concluding that an emergency call for help is nontestimonial and does not implicate the Confrontation Clause).  The victim's emergency call was not the type of pretrial testimony that the Supreme Court has identified as mandating that a defendant have the opportunity to cross-examine.

B.

Defendant next contends that the trial court erred in admitting out-of-court statements made by the son and the victim in violation of the Colorado Confrontation Clause, Colo. Const. art. II, §§ 16, 25. We disagree.

Where the prosecution seeks to admit nontestimonial statements and a defendant has not had a prior opportunity to cross-examine the witness, the prosecution must show that the declarant is unavailable and the statement bears sufficient indicia of reliability.  Compan v. People, supra; People v. Dement, 661 P.2d 675 (Colo. 1983).

"[U]navailability 'in a constitutional sense' is established by the prosecution when good faith, reasonable efforts have been made to produce the witness without success." Compan v. People, supra, 121 P.3d at 885 (quoting People v. Dement, supra, 661 P.2d at 681).

1.

The record is not clear as to the availability of the son. There is mention of, but no direct written or oral ruling relating to, the son's age and the trauma he suffered witnessing the murder as grounds for his unavailability. However, defendant did not object to the testimony in the trial court on the issue of availability and does not do so here. Therefore, we will presume that the son was in fact unavailable to testify.

We conclude that the son's statements possess sufficient indicia of reliability. As discussed above, the statements were made spontaneously or in response to structured interviews and are consistent with statements of a child who had no motive or instinct to fabricate the events of which he was speaking. Therefore, we find no error.

14

2.

Further, there is no question that as a result of her death, the victim was unavailable to testify.  In People v. Moore, 117 P.3d 1 (Colo. App. 2004), a division of this court held that when, as here, the issue is not whether the defendant killed the victim but his culpable mental state, the defendant forfeits his confrontation rights as to the victim's statements.  We agree with the rationale and holding in Moore.  Therefore, we find no error.

III.

Finally, defendant contends that the trial court improperly instructed the jury regarding its consideration of self-induced intoxication on the issue of mens rea for first degree murder.  We conclude there is no reversible error.

A.

As an initial matter, the People assert that defendant's contention is waived under the invited error doctrine.  We conclude that a plain error analysis is appropriate under the circumstances.

A party may not complain on appeal of an error that has been invited or injected into the case.  People v. Collins, 730 P.2d 293 (Colo. 1986).  The invited error doctrine applies to jury instructions.

15

People v. Zapata, 779 P.2d 1307 (Colo. 1989). However, invited error will not be applied where the error was not part of a defendant's trial strategy. People v. Stewart, 55 P.3d 107 (Colo. 2002).

Here, defendant proposed the jury instruction to which he now objects. However, defense counsel admitted during the conference that he did not understand the case law applicable to voluntary intoxication. Thus, we conclude the proffered jury instruction was not requested to obtain a tactical advantage; rather, the jury instruction was the result of ignorance, inadvertence, or negligence. Therefore, we review for plain error. People v. Miller, supra.

B.

In the context of jury instructions, plain error occurs when the entire record demonstrates a reasonable possibility that the improper instruction contributed to the defendant's conviction. People v. Sweeney, 78 P.3d 1133 (Colo. App. 2003). A trial court must correctly instruct the jury regarding the applicable law. People v. Rivas, 77 P.3d 882 (Colo. App. 2003).

Defendant's theory of defense on the count of first degree murder was voluntary intoxication.  Under § 18-1-804(1), C.R.S. 2005:

> [i]ntoxication of the accused is not a defense to a criminal charge, except as provided in subsection (3) of this section, but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.

For its part, § 18-1-804(3), C.R.S. 2005, provides that "[a] person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law."

On the one hand, § 18-1-804(1) provides that evidence of voluntary intoxication as relevant to the issue of whether a defendant actually formed the requisite culpable mental state of specific intent and acted after deliberation.  On the other hand, § 18-1-804(3) requires an inquiry into whether a defendant had the capacity to conform his conduct to the requirements of the law in light of intoxication that was not self-induced.  Therefore, jury instructions should not conflate § 18-1-804(1) and (3) by fusing the

"specific intent" element of § 18-1-804(1) with the "capacity to conform his conduct" in § 18-1-804(3).  People v. Harlan, 8 P.3d 448 (Colo. 2000).

Here, the intoxication instruction stated that the jury could "consider evidence of the defendant's self-induced intoxication in considering whether the defendant had the capacity to form the specific intent and act after deliberation as required for the crime of [murder in the first degree]" (emphasis added).  Defendant argues that the instruction improperly limited the jury's consideration of the self-induced intoxication evidence to whether he had the capacity to form, as opposed to whether he actually formed, the requisite culpable mental state and, by doing so, lowered the prosecution's burden of proof.  In other words, so goes the argument, it was possible for a properly instructed jury to conclude that while the voluntarily intoxicated defendant retained the capacity to form the requisite culpable mental state, he did not, in fact, do so.

While we agree that the jury instruction was improper under People v. Harlan, supra, we conclude there was no plain error.

18

The jury instructions taken as a whole held the prosecution to the proper burden of proof concerning the elements of first degree murder.  See People v. Miller, supra (in determining plain error we consider jury instructions as a whole).  The jury was instructed on three different occasions that the prosecution had to prove beyond a reasonable doubt each element of the offense.  The burden of proof instruction directed the jury that "[t]he burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged."  The voluntary intoxication instruction specifically informed the jury that "[t]he prosecution has the burden of proving beyond a reasonable doubt that the defendant in fact formed the specific intent and acted after deliberation as required for the crime of [murder in the first degree]."  Further, the elemental instruction for first degree murder admonished the jury that to find the defendant guilty of murder in the first degree, it must find that all the elements were proved beyond a reasonable doubt.

In addition, the prosecutor's discussion of the intoxication issue in closing argument was extensive.  Throughout, while the

prosecutor challenged the accuracy to the blood alcohol evidence, he argued that defendant had in fact formed the requisite culpable mental state despite his intoxication.  The argument encouraged the jury to use the intoxication evidence in determining whether defendant actually formed the requisite culpable mental state. From our review of both the opening and rebuttal argument, the prosecutor used the term "capacity" only once in passing.

Therefore, we conclude that the error did not so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.  Therefore, there was no plain error.

The judgment is affirmed.

JUDGE CARPARELLI and JUDGE RUSSEL concur.

Appendix 3

Jury Instructions

DISTRICT COURT
ARAPAHOE COUNTY, COLORADO
Court Address:  Arapahoe County Justice Center
7325 South Potomac Street, Englewood, CO 80112

THE PEOPLE OF THE STATE OF COLORADO vs.
Defendant:
**TROY JAMISON KELLY**

COURT USE ONLY

Case Number:
**00 CR 1636**
Division/Ctrm:
**ONE**

**JURY INSTRUCTIONS**

Instruction Nos. 1 through _25_ given by the Court this _21_ day of

_MAY_ , 2002.


James Macrum
District Court Judge

452

INSTRUCTION NO. ____/____

Members of the jury, the evidence in this case has been completed. In a moment I will read you the law which you must apply in order to reach your verdict. But first, I want to mention a few things that you need to keep in mind when you are discussing this case in the jury room.

It is my job to decide what rules of law apply to the case. While the lawyers may have commented during the trial on some of these rules, you are to be guided by what I say about them. You must follow all of the rules as I explain them to you. Even if you disagree or don't understand the reasons for some of the rules, you must follow them. No single rule describes all the law which must be applied. Therefore, the rules must be considered together as a whole.

During the course of the trial you received all of the evidence that you may properly consider to decide the case. Your decision must be made by applying the rules of law which I give you to the evidence presented at trial. Neither sympathy nor prejudice should influence your decision.

If you decide that the prosecution has proved beyond a reasonable doubt that the defendant has committed the crimes as charged, it will be my job to decide what the punishment will be. You should not try to guess what the punishment might be. It should not enter into your consideration at any time.

At times during the trial lawyers made objections to questions asked by other lawyers and to answers by witnesses. Do not draw any conclusions from such objections or from my rulings on the objections. These only related to the legal questions that I had to determine and should not influence your thinking. When I told you not to consider a particular statement, you were told to put that statement out of your mind, and you may not consider any statement in your deliberations

453

which you were instructed to disregard.

Finally, you should consider all the evidence in the light of your observations and experience in life.

INSTRUCTION NO. _____Z_____

The defendant, TROY JAMISON KELLY, is charged with committing the crimes of: MURDER IN THE FIRST DEGREE, which includes the crimes of MURDER IN THE SECOND DEGREE, MANSLAUGHTER and CRIMINALLY NEGLIGENT HOMICIDE; 2 Counts of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER, which include the crimes of MENACING WITH A DEADLY WEAPON and RECKLESS ENDANGERMENT; CHILD ABUSE and WIRETAPPING PROHIBITED in Arapahoe County, Colorado, on or about July 16, 2000.

The Defendant has pleaded not guilty.

**455**

INSTRUCTION NO. _3_

The charges against the defendant are not evidence.

456

INSTRUCTION NO. _4_

Every person charged with a crime is presumed innocent. This presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all of the evidence, you are then convinced that the defendant is guilty beyond a reasonable doubt.

The burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged.

Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative, or imaginary doubt, but such doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

As to each count, if you find from the evidence that each and every element has been proven beyond a reasonable doubt, you will find the defendant guilty as to that count. If you find from the evidence that the People have failed to prove any one or more of the elements of any count beyond a reasonable doubt, you will find the defendant not guilty as to that count.

INSTRUCTION NO. ___5___

The evidence in this case consists of the sworn testimony of all the witnesses and all exhibits which have been received in evidence.

You are to consider only the evidence in this case and reasonable inferences therefrom. An inference is a deduction or conclusion which reason and common sense lead the jury to draw from facts which have been proved.

INSTRUCTION NO. _____6_____

There are two types of evidence from which you may properly find the truth as to the facts of a case. One is direct evidence. The other is circumstantial evidence, that is, the proof of facts from which other facts may reasonably be inferred. The law makes no distinction between direct and circumstantial evidence.

INSTRUCTION NO. ___7___

The mere number of witnesses appearing for or against a certain proposition does not in and of itself prove or disprove said proposition.

INSTRUCTION NO. _____*8*_____

You may have to decide what testimony to believe.  You should carefully consider all of the testimony given and the circumstances under which each witness has testified.

Consider each witness' knowledge, motive, state of mind, demeanor, and manner while on the stand.  Consider the witness' means of knowledge, ability to observe, and strength of memory.  Consider also any relationship each witness may have to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.  You should consider all facts and circumstances shown by the evidence which affects the credibility of the witness' testimony.

You may believe all of the testimony of a witness, or part of it, or none of it.

461

INSTRUCTION NO. _____9_____

You have heard witnesses who have testified as experts.   You are not bound by the

testimony of experts; their testimony is to be weighed as that of any other witness.   It is entirely

your decision to determine what weight shall be given their testimony.

INSTRUCTION NO. _____10_____

The defendant is never compelled to testify, and the fact that he does not cannot be used as

an inference of guilt and should not prejudice him in any way.

INSTRUCTION NO. _____11_____

In this case you have heard out-of-court statements of Trystan Sanchez which were admitted into evidence.  You are instructed that it is for you to determine the weight and credit to be given these statements.  In making this determination, you shall consider the age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other evidence that has been admitted that you choose to consider for this purpose.

463

INSTRUCTION NO. ___/2___

The court admitted certain evidence for a limited purpose.  At that time, you were instructed not to consider it for any purpose other than the limited purpose for which it was admitted.

You are again instructed that you cannot consider evidence admitted for a limited purpose except for the limited purpose for which it was admitted.

465

INSTRUCTION NO. __13__

Certain evidence was admitted for a particular purpose only, and for no other. The witness testimony of Holly Griggs, Paul Griggs, Laurie Griffin, Tanya Bell, and certain portions of the testimony of Kathy Minor and Melody Flesher was such evidence. It may be used as evidence for the purpose of showing the defendant's intent, motive, identity and absence of mistake or accident in this case, and you should consider it as evidence for no other purposes.

INSTRUCTION NO. _14_

A crime is committed when the defendant has committed a voluntary act prohibited by law accompanied by a culpable mental state.  Voluntary act means an act performed consciously as a result of effort or determination.  Culpable mental state means intentionally or with intent, knowingly, recklessly, or with criminal negligence as explained in this instruction.  Proof of the commission of the act alone is not sufficient to prove that the defendant had the required culpable mental state.  The culpable mental state is as much an element of the crime as the act itself and must be proven beyond a reasonable doubt, either by direct or circumstantial evidence.

"After Deliberation" is part of the culpable mental state for Murder in the First Degree.  It means that the defendant acted not only intentionally, but, also, that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act.  An act committed after deliberation is never one which has been committed in a hasty or impulsive manner.

A person acts "intentionally" or "with intent" when his conscious objective is to cause the specific result proscribed by the statute defining the offense.  It is immaterial whether or not the result actually occurred.

A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists.  A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is practically certain to cause the result.

A person acts "recklessly" when he consciously disregards a substantial and unjustified risk that a result will occur or that a circumstance exists.

A person acts "with criminal negligence" when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustified risk that a result will occur or that a circumstance exists.

INSTRUCTION NO. _15_

You may consider evidence of the defendant's self-induced intoxication in considering whether the defendant had the capacity to form the specific intent and act after deliberation as required for the crime of MURDER IN THE FIRST DEGREE.

The prosecution has the burden of proving beyond a reasonable doubt that the defendant in fact formed the specific intent and acted after deliberation as required for the crime of MURDER IN THE FIRST DEGREE.

You may consider evidence of the defendant's self-induced intoxication in considering whether the defendant had the capacity to form the specific intent required for the crime of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER.

The prosecution has the burden of proving beyond a reasonable doubt that the defendant in fact formed the specific intent required for the crime of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER.

You may not consider evidence of the defendant's self-induced intoxication as to any other crime that you have been asked to consider or any lesser included offenses.

INSTRUCTION NO. ___16___

Concerning the charges in this case, certain words and phrases have a particular meaning.

The following are the definitions of these words and phrases.

"Bodily Injury" means physical pain, illness, or any impairment of physical or mental condition.

"Deadly Weapon" means any of the following which in the manner it is used or intended to be used is capable of producing death or serious bodily injury:

      a.   A firearm, whether loaded or unloaded;
      b.   A knife;
      c.   A bludgeon; or
      d.   Any other weapon, device, instrument, material or substance, whether animate or inanimate.

"Intoxication" means a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.

"Peace Officer" means a police officer who is employed by the state or any city within this state.

"Peace Officer Engaged in the Performance of his Duties" means a peace officer who is engaged or acting in the performance of any duty, service, or function imposed, authorized, required, or permitted by law to be performed by a peace officer, if the peace officer is in uniform or the person committing an assault upon or offense against or otherwise acting toward such peace officer knows or reasonably should know that the victim is a peace officer.

"Self-induced Intoxication" means intoxication caused by substances which the defendant knows or ought to know, have the tendency to cause intoxication which he knowingly introduced or allowed to be introduced into his body.

470

"Serious Bodily Injury" means bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

U. *471*

INSTRUCTION NO. __17__

The elements of the crime of MURDER IN THE FIRST DEGREE are:

1.      That the defendant,

2.      in the State of Colorado, at or about the date and place charged,

3.      with intent,

4.      to cause the death of a person other than himself, and

5.      after deliberation,

6.      caused the death of that person or another person.

After considering all the evidence, if you decide the prosecution has proven each of the elements beyond a reasonable doubt, you should find the defendant guilty of MURDER IN THE FIRST DEGREE.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty of MURDER IN THE FIRST DEGREE.

INSTRUCTION NO. _18_

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged if the evidence is sufficient to establish his guilt of the lesser offense beyond a reasonable doubt.

The offense of MURDER IN THE FIRST DEGREE, as charged in the information in this case necessarily includes the lesser offense of MURDER IN THE SECOND DEGREE, MANSLAUGHTER and CRIMINALLY NEGLIGENT HOMICIDE.

The elements of the crime of MURDER IN THE SECOND DEGREE are:

    1.    That the defendant,

    2.    in the State of Colorado, at or about the date and place charged,

    3.    knowingly,

    4.    caused the death of another person.

The elements of the crime of MANSLAUGHTER are:

    1.    That the defendant,

    2.    in the State of Colorado, at or about the date and place charged,

    3.    recklessly,

    4.    caused the death of another person.

The elements of the crime of CRIMINALLY NEGLIGENT HOMICIDE are:

1.   That the defendant,

2.   in the State of Colorado, at or about the date and place charged,

3.   caused the death of another person,

4.   by conduct amounting to criminal negligence.

You should bear in mind that the burden is always upon the prosecution to prove beyond a reasonable doubt each and every material element of any lesser included offense which is necessarily included in any offense charged in the information; the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.

After considering all the evidence, if you decide that the prosecution has failed to prove one or more elements of the crime charged or of a lesser included offense, you should find the defendant not guilty of the offense which has not been proved, and you should so state in your verdict.

While you may find the defendant not guilty of any or all of the crimes charged, or of any or all of the lesser included offenses, you may not find the defendant guilty of more than one of the following offenses:

**MURDER IN THE FIRST DEGREE**

**MURDER IN THE SECOND DEGREE**

**MANSLAUGHTER**

**CRIMINALLY NEGLIGENT HOMICIDE**

**474**

INSTRUCTION NO. _____ 19 _____

The elements of the crime of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER are:

1.  That the defendant,

2.  in the State of Colorado, at or about the date and place charged,

3.  with intent to cause serious bodily injury,

4.  to a peace officer,

5.  threatened with a deadly weapon a peace officer,

6.  while the peace officer threatened was engaged in the performance of his duties, and

7.  the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his duties.

After considering all the evidence, if you decide the prosecution has proven each and every element beyond a reasonable doubt, you should find the defendant guilty of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER.

475

You should bear in mind that the burden is always upon the prosecution to prove beyond a reasonable doubt each and every material element of any lesser included offense which is necessarily included in any offense charged in the information; the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.

After considering all the evidence, if you decide that the prosecution has failed to prove one or more elements of the crime charged or of a lesser included offense, you should find the defendant not guilty of the offense which has not been proved, and you should so state in your verdict.

While you may find the defendant not guilty of any or all of the crimes charged, or of any or all of the lesser included offenses, you may not find the defendant guilty of more than one of the following offenses:

**ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER**

**MENACING WITH A DEADLY WEAPON**

**RECKLESS ENDANGERMENT**

INSTRUCTION NO. _20_

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged if the evidence is sufficient to establish his guilt of the lesser offense beyond a reasonable doubt.

The offense of ASSAULT IN THE FIRST DEGREE ON A PEACE OFFICER as charged in the information in this case necessarily includes the lesser offenses of MENACING WITH A DEADLY WEAPON and RECKLESS ENDANGERMENT.

The elements of the crime of MENACING WITH A DEADLY WEAPON are:

1.   That the defendant,

2.   in the State of Colorado, at or about the date and place charged,

3.   by threat or physical action,

4.   knowingly placed or attempted to place another person in fear of imminent serious bodily injury.

5.   by the use of a deadly weapon.

The elements of the crime of RECKLESS ENDANGERMENT are:

1.   That the defendant,

2.   in the State of Colorado, at or about the date and place charged,

3.   recklessly engaged in conduct,

4.   which created a substantial risk of serious bodily injury,

5.   to another person.

INSTRUCTION NO. _21_

The elements of the crime of CHILD ABUSE are:

1.     That the defendant,

2.     in the State of Colorado, at or about the date and place charged,

3      knowingly or recklessly permitted the child to be unreasonably placed in a situation

       which posed a threat of injury to the child's life or health,

4.     and the child abuse resulted in any injury other than serious bodily injury.

After considering all the evidence, if you decide the prosecution has proven each and every element beyond a reasonable doubt, you should find the defendant guilty of CHILD ABUSE.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty of CHILD ABUSE.

INSTRUCTION NO. ___22___

The elements of the crime of WIRETAPPING PROHIBITED are:

1. That the defendant,

2. in the State of Colorado, at or about the date and place charged,

3. acting other than as a sender or intended receiver of a telephone communication,

4. knowingly,

5. prevented, obstructed or delayed, by any means whatsoever, the sending, transmission, conveyance, or delivery in the State of Colorado of any message, communication or report,

6. by or through any telephone or telegraph line, wire, cable or facility, or any electronic, mechanical or other device.

After considering all the evidence, if you decide the prosecution has proven each and every element beyond a reasonable doubt, you should find the defendant guilty of WIRETAPPING PROHIBITED.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty of WIRETAPPING PROHIBITED.

INSTRUCTION NO. _____ 23

In this case, a separate offense is charged against the defendant in each count of the information. Each count charges a separate and distinct offense, and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count. The fact that you may find the defendant guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against the defendant.

The defendant may be found guilty or not guilty of any one or all of the offenses charged.

INSTRUCTION NO. _____24___

Once you begin your deliberations, if you have a question about the evidence in this case or about the instructions or verdict forms that you have been given, your Foreperson should write the question on a piece of paper, sign it and give it to the bailiff who will bring it to me.

I may then confer with the attorneys as to the appropriate way to answer your question. However, there may be some questions that, under the law, I am not permitted to answer.  If it is improper for me to answer the question, I will tell you that.  Please do not try to guess about what the answer to your question might be or why I am not able to answer a particular question.

INSTRUCTION NO. _25_

The bailiff will now escort you to the jury room. Upon reaching the jury room, you are to select one of your members to be the foreperson of the jury. Your foreperson will preside over your deliberations and shall sign whatever verdict you reach.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

Only one verdict shall be returned signed for each count, and these verdicts and instructions shall remain in the possession of your foreperson until such time as they are called for in open court. Upon reaching a verdict, you will inform the bailiff of this Court, who in turn will notify the Court, and you will remain in your jury room until called into the Courtroom.

You will be provided with _5_ forms of verdict. When you have unanimously agreed upon your verdicts, you will select the verdicts which reflect your unanimous decision and the foreperson will sign them as the Court has stated. The verdict forms and the original instructions shall be returned with no markings on them.

The forms of verdict you will receive read as follows: (read all verdict forms). You are further instructed that no inferences are to be drawn from the order in which the Court reads the verdicts.

Appendix 4

Closing Arguments

1   will read after closing arguments.

2                   People's closing.

3           MR. HOWER:  Good morning, ladies and

4   gentlemen of the jury.

5           THE JURY:  Good morning.

6           MR. HOWER:  It's been a very long and

7   difficult three weeks for you.  You've had to see

8   some things and hear some things that were

9   terrible to have to see and hear.  And on behalf

10  of the People of Arapahoe County and the many

11  agencies that have been involved in this

12  investigation and the friends and the relatives

13  of Patricia and Trystan, I want to thank you very

14  much for that willingness you all have shown to

15  come in here and perform this very difficult but

16  very important civic duty.

17              Your duties are about to conclude.  You

18  have received all of the evidence in the case.

19  The judge has given you the instructions of law

20  and definitions that apply.  In a few minutes,

21  the lawyers will sit down and be quiet, and it

22  will then become your duty to go back to the jury

23  room and compare the evidence to the law and

24  determine if the evidence has proven the

25  defendant guilty of these crimes beyond a

1    reasonable doubt, not a doubt that's vague or

2    speculative or imaginary, but a doubt that is

3    based upon common sense and reason.

4           Before we talk about some of the

5    evidence and some of those elements, I want to

6    talk about some of the instructions that you've

7    heard that may be causing some confusion or

8    perhaps not.

9           You know that the defendant was charged

10   with murder in the first degree, first degree

11   assault on a peace officer, child abuse and

12   wiretapping, and now you've heard about some

13   other charges, what we call lesser included

14   offenses.  And how should you deal with those,

15   and what are those?  The best example I can give

16   you to simplify it would be if a person is

17   charged, say, with speeding 20 miles over the

18   speed limit, that charge would necessarily

19   include speeding 15 miles over the speed limit,

20   and ten miles over the speed limit and five miles

21   over the speed limit, so that if the evidence

22   should fail to prove that he, in fact, was

23   speeding 20 miles over the speed limit, but did

24   show 15 miles over, then you could find him

25   guilty of speeding 15 miles over the speed limit.

1    It's a very simplified example.

2         But basically what I would suggest to
3    you in terms of how to handle these lesser
4    included offenses is that you start with the top.
5    You start with the charge that was filed, murder
6    in the first degree, first degree assault on a
7    peace officer, and compare the evidence to the
8    law as to those charges.  And if you, all 12,
9    unanimously decide he is not guilty of murder in
10   the first degree, then you can look at the
11   second, the lesser offense, and so on down the
12   road.

13        Now, the question is, what is it that
14   needs to have been proven?  And you have received
15   the elements of these offenses.  They tell you
16   the facts and circumstances of each crime that
17   have to have been proven.  When you look at
18   those, you will see there are many that are not
19   in dispute.  We know what happened to Patricia on
20   July the 16th, 2000, we know how it was done, and
21   we know who did it.  It was the hand of Troy
22   Kelly that held this knife and used it to rip the
23   life out of Patricia Green on the night of July
24   16th, 2000.

25        From the beginning, when the defendant

1    was apprehended literally red-handed, still

2    holding that bloody knife in his hand, it could

3    never be disputed what happened, how it happened,

4    and who did it.  Therefore, defense has taken the

5    avenue -- they have left open to it, the mental

6    elements of first degree murder.  The defense

7    basically is, yes, he stabbed her, he slashed her

8    to death, but he didn't mean to.  He didn't

9    intend to.  He didn't deliberate because he was

10   drunk, because he had consumed so much alcohol

11   that he was incapable of forming the intent,

12   incapable of acting after deliberation.

13            Proving intent is always a challenge.

14   We cannot read people's minds.  Intent has never

15   been proven for any crime anywhere at any time

16   except through the facts and circumstances

17   surrounding what happened, the how it was done,

18   what was done, the tools or implements that were

19   chosen to do it, and the context in which it

20   occurred.  So I want to spend a few moments

21   talking about those things, the how, the what,

22   the tool and the context.

23            The defendant had to choose his tool,

24   his implement, his weapon.  He didn't choose the

25   first hard object at hand, the first sharp object

1    at hand.  He chose to use his favorite hunting

2    knife, of which he was proud.  He had to remember

3    where it was and go get it.

4         You heard from the defendant's brother,

5    Brady Kelly, that -- what Brady told you was the

6    defendant always kept that knife in its original

7    box.  The box, you heard, was found in a kitchen

8    drawer.  That's consistent with something that

9    Trystan conveyed when he heard Tony and Sedona

10   arguing months later.  He heard them arguing.  He

11   heard Tony, because he was cooking, get into that

12   kitchen drawer and start rattling things around,

13   and he screamed in terror, "Daddy, are you

14   getting a sharp knife to kill Sedona?"  Whether

15   he got it from a kitchen drawer or wherever, he

16   had to remember where it was.  He had to go get

17   it.  He had to take it out of its sheath,

18   discarding the sheath inside the door of the

19   master bedroom, and chased Patricia in the

20   hallway, stabbing and slashing at her back.

21        Remember the blood trail, the blood

22   drops that Sergeant Thompson saw when he first

23   got there and the blood smear on the wall in the

24   hallway.  It started in the hallway, at least in

25   the hallway.  Remember, and you'll see the

1    pictures of the wounds to Patricia's back and the

2    back of her neck.  He kicks open the door to

3    Trystan's room, traps Patricia in that corner and

4    slashes and stabs her at least a dozen more

5    times.  And they're not wild stabs.  They're not

6    random thrashing about with few exceptions.

7    Every single one is in the region of her chest,

8    her heart, her neck and her throat where he would

9    attack if it was his intent to kill.  They

10   weren't all on target.  They weren't all real

11   accurate.  They certainly weren't all fatal.  But

12   remember, she wasn't standing still waiting to be

13   slaughtered.  She was trying to fight for her

14   life with the one good arm that she had left to

15   her.

16              But why?  Why would he do that?  Now,

17   motive is not an element.  Motive need not be proven.

18   If the evidence proves that the defendant acted

19   intentionally and after deliberation, then it need

20   not prove why he did what he did.  But the evidence

21   in this case has clearly shown there is a motive, and

22   that motive can help you understand his intent and

23   his deliberation.

24              Patricia herself in some of her last

25   words she ever spoke helps us understand that motive.

1    "Don't, Troy.  No.  I'm innocent.  Please, please,

2    please.  Just don't.  Don't kill me.  Please don't.

3    No.  I'm innocent."  He has accused her of something.

4    She has denied it.  He's pled not guilty, and this is

5    her trial.

6                    (Tape played.)

7              MR. HOWER:  This is Patricia's trial.

8              (The tape was played.)

9              MR. HOWER:  The defendant had appointed

10   himself her judge and her jury and her

11   executioner.  What he had -- he accused her of --

12   based upon what we know about this defendant,

13   there isn't much question about what it is that

14   he had accused her of.  She told her mother that

15   last week in June when she was staying there and

16   the defendant was calling every ten or 15

17   minutes.  She said, "Mom, he is jealous.  He's

18   very jealous.  He doesn't think I'm here.  He

19   thinks I'm with some guy."  This is the guy she

20   was with.  It's the only guy she was with other

21   than him from the time they started dating.  But

22   that didn't stop him from accusing her.  She told

23   Sedona or asked Sedona, "Are you jealous of the

24   fact that Tony and I have to see each other and

25   talk to each other?"  And of course, Sedona said,

1    "No.  You're Trystan's parents."  But she told --
2    Patricia told Sedona, "Troy is jealous.  Troy
3    didn't understand."
4            Now, defense lawyer would have you
5    believe that jealousy could not possibly have
6    been the defendant's motive.  After all he had
7    found a new girlfriend.  He had moved on.  He had
8    found this Liz person about whom you've heard
9    very often but learned very little.  And he was
10   moving her into the apartment.  So he couldn't
11   possibly be jealous of Patricia.  But, ladies and
12   gentlemen, don't mistake love -- don't mistake
13   jealousy for love.  You know from your own
14   experiences in life and your own common sense for
15   some people jealousy is merely a need to control
16   and dominate their partner that has little or
17   nothing to do with love.  Did the defendant
18   demonstrate such a need and desire to control and
19   dominate Patricia?
20           Recall what Susan Trunde told you, a
21   friend from work.  Patricia explained she had to
22   carry that cell phone and that pager all the time
23   so the defendant could call her, know where she
24   was and who she was with and what she was doing.
25   Remember the testimony of her friends and

1    co-workers, her sisters and her mother how often
2    and how frequently he would call her at work, at
3    home, wherever she was.  She had to ask his
4    permission if she wanted to visit with her
5    sisters or her mother.  She thought she had to
6    wear and buy tight pants and short shorts because
7    that's what he said she should wear.  This need
8    to control and not be controlled was not new with
9    Patricia.
10         When Hollie Griggs tried to tell him to
11   control his behavior and tell him he couldn't
12   take off that face plate from her stereo and
13   throw it out the window, you can't do that, do
14   you remember what he did?  He took out a knife
15   and opened it and said, you know what I can do
16   with this?  When Hollie slipped out of his
17   control and moved out of that apartment while he
18   was at work and moved back to her parents' house,
19   the defendant called her parents' house, and
20   Hollie's father, Paul Griggs answered.  Paul
21   Griggs tried to tell him what he could or could
22   not do in regard to Hollie.  "You leave Hollie
23   alone.  You don't call her here.  You don't come
24   here."  The defendant told him, "You can't tell
25   me what to do."  And Mr. Griggs said, "If you

1    come here, I'll deal with you."  The defendant's

2    response was, "I'll deal with you, and then I'll

3    deal with your whole family."

4           When Hollie and her friend, Tanya Bell,

5    tried to control his behavior and tell him that

6    he could not be calling her apartment after she

7    had gotten a restraining order against him, do

8    you recall his response to them?  You can't --

9    excuse me -- he tells Hollie, "I'm going to fuck

10   you up."  He tells Tanya, "Every time you and

11   your little friend go into your room, you better

12   check the closet."

13          The defendant's jealousy had nothing to

14   do with love, had nothing to do with finding a

15   new girlfriend.  It had everything to do with the

16   need to control and dominate.  And I submit what

17   the evidence shows is that arose from a need to

18   avoid abandonment and to -- he could not tolerate

19   and would not tolerate his partner turning her

20   back on him and walking away from him, much less

21   try to leave him.

22          You will recall on the Friday before

23   Patricia's murder Patricia told her friend,

24   Rebecca, "The longer it is since I see him, the

25   worse it will be when I do."  And she had been

1    away for at least two consecutive nights, and she

2    knew the punishment that was coming.

3         This also was not new to the defendant.

4    When Laurie Griffin would tell him "I'm leaving"

5    and try to get out of the apartment, he would

6    physically block her way, grab her, tell her,

7    "You're not going anywhere, you're not leaving."

8    And remember the words, "You're not getting out

9    of here alive."

10        Hollie Griggs' experiences showed that

11   it was a risky thing for his partner to turn her

12   back on him and walk away from him in the middle

13   of an argument.  He threw a T.V. remote across

14   the room and hit her on the back of the head when

15   she tried to get away from him and walk away from

16   him during an argument.  And she and her friends

17   then went down out of the apartment, but he came

18   back -- and he came after them, rather,

19   apologized and persuaded her to come back.  He

20   did not want her to leave.

21        When Hollie's friend, Nicole, tried to

22   get her to leave the apartment on one occasion when

23   they had become involved in an argument and he -- and

24   Hollie and Nicole went downstairs across the street,

25   into the parking lot, and got to their car, the

1      defendant came chasing after them down the stairs,
2      across the street, into the parking lot, insisted
3      that Hollie go back to the apartment, physically
4      nudged and pushed her back to the apartment, and she
5      went.  She told you why.  She didn't want to make him
6      any angrier than he already was.  He didn't want her
7      to leave.

8                      When Hollie was in the Acker twins'
9      apartment, and she and the defendant were on a sofa
10     and became involved in an argument and Hollie says,
11     "I'm leaving," he said, "You're not leaving."  She
12     tried to get up.  He held her down.  She managed to
13     get away from him and run through the door.  He
14     chased after her.  He caught her.  He put his hand
15     around her throat, knocked her to the ground, kicked
16     her in the stomach, and took her baseball cap.  That
17     cap didn't mean anything to Troy Kelly.  It meant
18     something to Hollie.  And that was how he could
19     punish her for trying to leave him.  He would later
20     punish Patricia much more severely.  He took Hollie's
21     hat.  He took Patricia's life.

22                      I want to go back for just a moment to
23     this issue of jealousy.  You will recall how this
24     defendant would react to jealousy when he called
25     Hollie's apartment and he heard male voices in the

1    background, and this was when they were no longer in

2    a relationship, but he heard those male voices in the

3    background, and he says, "If there's guys over there,

4    I'm coming over.  I'm going to kick your ass.  I'm

5    going to kick your ass.  And I'm going to beat the

6    shit out of your car."  And then he came charging

7    over and pounded on the door.  "Do you know what I'm

8    going to do to you?  Do you know what I'm going to do

9    to you," he hollered, but Hollie had locked the door

10   and called the police, and the police got there, and

11   she didn't find out.

12              As far as the defendant's need to

13   control, how did that manifest itself when Patricia

14   started to try to leave him?  You remember first

15   thing, the lease.  He wouldn't let her off the lease.

16   Her signature on that lease and her desire to

17   maintain her credit became a very powerful weapon and

18   tool that he could use to maintain control over her

19   and to keep her from leaving.

20              On July 3rd when she and Sherry

21   Salazar went to the apartment and the intent was to

22   move her stuff out of the apartment and Patricia

23   became very emotional and cried because she loved

24   that apartment despite everything that was going on,

25   she did love that apartment, she felt she had messed

1   up her life, that she had been stupid.  She had made

2   so many mistakes, and the defendant didn't want her

3   to leave.  He wasn't violent this time.  He was a

4   nice guy.  He says, "You can stay here.  You can stay

5   in Trystan's room.  I won't bother you.  I'll leave

6   you alone."  And he seemed so nice that even her best

7   friend, Sherry Salazar, advised her maybe she should

8   stay and do that.  Poor Sherry did not know how

9   terrible that advice would turn out to be.

10          Patricia told Melody, her sister, that

11   when she told the defendant she was leaving him his

12   reaction was, you wouldn't leave, and he viewed that

13   as a threat.  But by the night of July the 16th when

14   Patricia was leaving, she had made up her mind, there

15   was nothing, no promises, no threats, no apologies

16   were going to prevent her from getting herself and

17   Trystan away from the defendant and out from under

18   his control.  He had lost his control, and he knew

19   it, and that is why on that last weekend that she

20   spent with her mother and her sisters in Woodland

21   Park he didn't try to call her one time on her cell

22   phone or there.  He knew it was over.  He had lost

23   control of her.  But he wasn't going to tolerate it.

24   He wasn't going to stand for it.  He would rather her

25   be dead than out from under his control.  And he

1    chose the right instrument, and he took the right

2    steps to make sure she would die.

3              Ladies and gentlemen, drunk or sober,

4    there simply can be no doubt as to what his intent

5    was and that he was acting intentionally.

6              What about deliberation?  Read the

7    instruction that defines "after deliberation."  Look

8    at what it says it is and what it says it isn't.  One

9    thing to note, there is no time frame requirement.

10   The defendant doesn't have to think about this for a

11   day or for an hour or for a moment.  It's not

12   required that he sit down with pencil and paper and

13   have cons and pros and advantages and disadvantages

14   and mull it over and think about it and come to a

15   decision.  You know from your own life experiences

16   and your common sense deliberation can take place in

17   a heartbeat.

18             It also certainly does not require

19   that the decision made be a good decision.  If that

20   were the case, no one could ever be convicted of

21   first degree murder after deliberation.  When is the

22   decision to unlawfully kill another human being a

23   wise or correct or good decision?  An act committed

24   after deliberation is best defined by that part of

25   the instruction that tells you what it is not.  It is

48

1    not an act committed in a hasty or an impulsive

2    manner, and that happens all the time.  Road rage

3    situations, a couple arguing, one does something or

4    says something, and the other one snaps and grabs the

5    first available object, hard object, a rock, a

6    pencil, a fireplace poker, strikes the other a fatal

7    blow, that's hasty.  That's impulsive.  That's not

8    after deliberation.  And that's not what happened

9    here.

10            Again, the defendant had to decide

11   what he was going to use.  He had to go find it.  He

12   had to retrieve it.  He had to pull it out of this

13   sheath, chase her into Trystan's room, and then you

14   heard the tape, he had to listen to her pleading,

15   "Don't kill me.  I'm innocent.  Please don't kill me.

16   I don't want him to see."  She didn't want Trystan to

17   see her being murdered that way.  He had to listen to

18   Trystan screaming, crying, "Momma," listen to Trystan

19   pleading, "Don't kill mommy.  Don't kill my mommy."

20   And then stab her not once, not twice, not three

21   times, not four times, not five, six, seven, eight,

22   nine, ten, 11 en, 12, and more times.  Ladies and

23   gentlemen of the jury, that is with intent.  That's

24   after deliberation.

25            What about intoxication?  You've heard

1    a lot about that.  How does that play into this?

2    What effect, if any, does it have on intent and

3    deliberation?  Well, unlike what counsel, defense

4    attorney told you in jury selection and in opening

5    statement, it's not a defense to first degree murder.

6    It is a factor that you can consider along with all

7    of the other evidence to determine if, in fact, the

8    defendant acted intentionally and after deliberation,

9    if, in fact, he acted intentionally and after

10   deliberation.  And I submit we -- it really isn't

11   necessary that we spend that much time talking about

12   intoxication because if the evidence has satisfied

13   your reason and common sense that he did act

14   intentionally and after deliberation, then it doesn't

15   matter whether he was drunk or sober.  But a lot of

16   smoke is in the air about intoxication, and we need

17   to spend a few minutes to clear that air.

18                    First of all, think about what the

19   evidence is in this case.  What is the evidence that

20   he was intoxicated?  The alcohol in his urine, we

21   sometimes say that the other way around, that is a

22   terrible thought.  The alcohol in his urine does

23   indicate that he was drinking.  That's hardly a

24   surprise.  When was he not drinking?  But the alcohol

25   in his urine, as the experts told you, it doesn't

1          tell you how much he had been drinking or how much

2          alcohol was in his system at the time he killed

3          Patricia.

4                          What about Dr. Wingeleth?  He

5          conducted some blood tests.  He tested those three

6          tubes of blood to determine how much alcohol was in

7          the blood in these tubes on May the 9th, 2002.

8          Unfortunately, results of his tests are meaningless.

9          Scientifically and legally in order to obtain

10         scientifically and legally reliable results of the

11         test for the testing of blood for alcohol, it has to

12         be done a certain way using certain procedures and

13         certain equipment, and it's not some legal

14         technicality.

15                         MR. STEINBERG:  Judge, I'll object to

16         this.  There is no instruction and there is

17         absolutely no law, and to use this term legally

18         is improper.  There is no requirement -- if this

19         were a D.U.I. case, it might be a suggestion, but

20         this suggestion to this jury that this test was

21         not done legally is improper.

22                         THE COURT:  This is argument.  The

23         jurors have heard the testimony from the two

24         experts about what a legal draw means, and both

25         sides can comment on that.  So I'll sustain the

1   objection with respect to emphasizing what the

2   word legal --

3          MR. STEINBERG:  Thank you.

4          MR. HOWER:  Those requirements are not

5   based upon legal technicality.  It's based upon

6   science.  Because if that blood wasn't drawn

7   using appropriate methods, appropriate and

8   approved equipment in the right manner, in tubes

9   containing sodium fluoride with their sterility

10  maintained, then fermentation will occur.

11  Alcohol not only can but will be produced in that

12  blood, even if there was no alcohol in the

13  person's system at the time that the blood was

14  drawn.  There's no question there was alcohol in

15  the system at the time the blood was drawn.  But

16  fermentation would also make that amount of

17  alcohol appear much greater.  That's what

18  occurred.  That's what occurred here.

19          You will recall the testimony.  This

20  blood wasn't drawn for a legal blood draw.  It

21  was drawn for medical purposes.  The procedures

22  used did not include the non-ethyl based swipe.

23  The tubes did not contain sodium fluoride.  And

24  most significantly, the sterility of those tubes

25  was breached very early on when they had to take

1    blood out to test it.  Blood in those two tubes

2    would do no good unless they had reached

3    sterility and tested it.  Bacteria was

4    introduced.  Fermentation did occur.

5         Dr. Wingeleth's test is very reliable

6    to tell you how much alcohol was in that blood on

7    May the 9th of 2002, but it doesn't give you a

8    clue as to how much alcohol was in his system

9    when it was drawn from his body, much less when

10   he was killing Patricia a couple of hours

11   earlier.  That's why the El Paso County Coroner's

12   Office would not test those tubes.  They would

13   not engage in scientific testing, the results of

14   which would be scientifically unreliable.  And

15   even Dr. Wingeleth agreed not one of those tubes

16   by itself gives you any indication of how much

17   alcohol, if any, was in his system at the time

18   that he killed Patricia.  But then he tells you

19   because the results of all three, according to

20   him, are similar or close to each other, that

21   somehow that makes all three reliable.

22        I submit that's a bizarre theory for a

23   scientist to propose.  Three completely

24   unreliable tests somehow combine to make three

25   reliable tests.  This isn't three wrongs make a

1    right.  That's three wrongs make three rights,

2    and it makes no sense.

3            You will recall what forensic

4    toxicologist from the El Paso County Coroner's

5    Office, Joe Levitsky, told you.  That was

6    nonsense.  Of course, the results would be

7    similar.  They were all drawn from the same

8    person by the same people at the hospital at

9    about the same time using the same equipment.

10   All of them stored in tubes without sodium

11   fluoride.  All of them having been exposed to

12   bacteria early on.  All of them fermenting for 21

13   months.  And then all of them being tested by the

14   same people at the same lab, using the same

15   procedures and the same methods.  You don't have

16   to be a scientist to know your results are going

17   to be similar.

18           If you cannot place any reliance on

19   what the blood/alcohol content was in order to

20   determine if the defendant was so intoxicated

21   that he couldn't act intentionally, how about his

22   actions?  Were they consistent with somebody at a

23   .26 at 8:40 on July 16th?  Was he acting the way

24   somebody with a .26 would act?  Wingeleth told

25   you, an experienced drinker might be able to

1     compensate for some of the physical effects, but

2     he would not be able to for the mental effects.

3     And at a .25 and above, according to Dr.

4     Wingeleth, nobody can act deliberately, act

5     intentionally, that above a .25, everyone would

6     be basically operating on automatic in the most

7     basic functions, automatic functions.  Since when

8     is doing what he did a basic, automatic human

9     function?  Remember where he left that knife,

10    getting it, getting it out of the sheath, chasing

11    her through the apartment, trapping her, slashing

12    her, a 23-year-old, healthy, sober female.

13    That's not a basic, automatic function -- human

14    function.

15           What about his thought processes and

16    abilities in regards to the telephone?  You will

17    recall what Mr. Hammond, Al Hammond of the

18    Colorado Bureau of Investigation, told you that

19    telephone cord had been looped in one hand,

20    apparently, and cut with one slice of the knife

21    neatly and cleanly in two.  There was no sawing

22    at it.  There were no false starts.  It was a

23    quick and decisive action, loop the cord, slice

24    it with a knife.  Did the defendant know, did he

25    recognize what a telephone is?  Did he recognize

1    what she was using it for, to try to call for

2    help?  Did he intend to prevent her from calling

3    for help?  Did he have the mental and physical

4    ability to do so once he saw that?  Is that the

5    action of an alcohol-numbed brain acting on

6    automatic?

7             Ladies and gentlemen, if the People

8    had to prove that the defendant was intoxicated, if

9    one of the elements of these offenses was that he was

10   drunk and we had the burden of proving it beyond a

11   reasonable doubt that he was intoxicated, based on

12   the blood/alcohol tests of Dr. Wingeleth and the

13   actions of the defendant, could you in good

14   conscience find him guilty?  Would that element have

15   been proven even for a D.U.I.?

16            Let's assume for the sake of argument

17   that the defendant was intoxicated.  There's probably

18   a good chance of that based on what you know about

19   him.  Let's assume he was very intoxicated.  Does

20   that mean he could not deliberate, that he didn't

21   have the capacity to deliberate or act intentionally?

22   Or does it mean that the results of his deliberation

23   would not be very good?  Remember, Dr. Wingeleth

24   agreed with part of this at least, that drunk on the

25   bar stool at closing time has a decision to make.  He

1   wants to go home.  He intends to go home.  How is he

2   going to do it?  He can call a cab or he can try to

3   drive home.  If his decision is to drive home, it's

4   no less a decision, no less deliberate, no less

5   intentional simply because it was a very bad

6   decision.  He was faced with options.  He chose among

7   them.  It was a bad choice.  It was not a lack of

8   deliberation.

9           And you know that alcohol is not the

10  only thing that can cause people to deliberate and

11  yet come up with a bad choice.  Anger, jealousy,

12  revenge, greed, lust and alcohol are all things that

13  can cause people to deliberate.  They don't prevent

14  deliberation, they just cause bad choices.

15          When does deliberation have to occur?

16  It's kind of obvious because it's an act after

17  deliberation.  Deliberation has to occur before the

18  act.  The reason I bring that up is you will recall

19  what my discussion was with Dr. Wingeleth on another

20  aspect of alcohol.  Some people drink because they

21  want the effects that they get from alcohol.  We

22  talked about the shy man who wants to ask a lovely

23  lady out on a date, but he is afraid to do so.  He's

24  afraid he's going to be rejected.  But he

25  deliberates, and he decides, and he intends he is

1    going to ask her out on a date.  But however, before

2    he does, he starts drinking alcohol to build up his

3    courage, to lower his inhibitions, to lower his fear

4    of rejection, and so by the time he calls her and

5    asks her for that date, he's drunk, and he asks her.

6    He is asking her intentionally and it's after

7    deliberation.  The alcohol merely helped him do what

8    he wanted to do, what he intended to do, and what

9    he's doing deliberately.

10           Two final thoughts on intoxication and

11   how -- and the evidence shows the defendant did act

12   intentionally and after deliberation.  He knew

13   exactly what he had done on the night of July 16th.

14   Do you remember Sergeant Thompson's testimony?  He

15   comes into the room.  He sees two people on the

16   floor.  He starts asking, "What happened?  What

17   happened?"  Trystan sits up in bed and says, quote,

18   he said, "He killed my mommy.  Now, mommy's dead."

19   Think about that.  After that phone cord got cut,

20   they're still there, the defendant and Trystan and

21   Patricia in that room.  And you know what Trystan was

22   doing?  He was creaming.  He was crying.  He was

23   asking for his mommy.  And the defendant tells him,

24   "I killed your mommy.  Mommy's dead."

25           And what about Trystan?  Dr. Wingeleth

1   and the defense counsel would have you believe that

2   the defendant was in some kind of a drunken stupor, a

3   drunken rage, slashing and thrashing about

4   indiscriminately, no mental process involved

5   whatsoever, no intentional action.  He cut Patricia

6   to pieces.  He didn't lay a finger on Trystan.  What

7   does that tell you?  Trystan was not his intended

8   target.  Patricia was his intended target.

9                   Ladies and gentlemen, the bottom line

10   on intoxication is it doesn't matter.  The defendant

11   doesn't have to prove anything in this case,

12   including he doesn't have to prove he was drunk, and

13   the People don't have to prove he was sober.  The

14   evidence has to prove that he acted intentionally,

15   and that he acted after deliberation, and it has done

16   so.

17                   And, ladies and gentlemen, the issue

18   in this case is now in your hands.  You can't bring

19   Patricia back.  You can't give her back her life.

20   You can't give Trystan his mommy back.  But you can

21   give Trystan and Patricia and their family and this

22   community justice by holding this murderer

23   accountable for the crime he committed, not some

24   lesser crime based upon self-induced intoxication and

25   drunkenness, but for the crime that he committed, the

1     first degree murder after deliberation of Patricia

2     Green.   Thank you.

3                THE COURT:  All right.  Thank you.

4                Ladies and gentlemen of the jury, it's

5     going to be necessary at this point that we take

6     a break before you hear from Mr. Steinberg.   If

7     you could leave your notebooks here.   Mr. Kane

8     will take you back upstairs.   Then he'll bring

9     you back at ten minutes after 11:00.   We'll close

10    out the case, and then you'll begin your

11    deliberations.   So if you could go with Mr. Kane,

12    he'll take you back up to the fourth floor and

13    bring you back at ten after.   We'll be in recess

14    for 15 minutes.

15                (Jury out.)

16                THE COURT:  All right.  We should be --

17    he should be able to go outside.   The jurors are

18    going to be on the fourth floor.   We'll start ay

19    11:10.

20                (A recess was taken.)

21                THE COURT:  All right.  Welcome back,

22    members of the jury panel.   We're back on the

23    record.

24                Mr. Steinberg.

25                MR. STEINBERG:  Thank you.

1          Good morning, folks.

2          THE JURY:  Good morning.

3          MR. STEINBERG:  You know, you do this

4    long enough, and you promise yourself that you're

5    not going to get angry because getting angry

6    never does you any good, and then things happen,

7    and you have to break that promise.  So when a

8    prosecutor gets up here and says to you, for the

9    sake of the family, for the sake of the child and

10   for the sake of the friends do justice, he knows

11   what he's saying to you is improper.  He does it

12   anyway.

13         MR. HOWER:  Judge, I object to that.

14   It was not improper.

15         MR. STEINBERG:  It's improper.  It's an

16   appeal to emotion.  It has nothing to do with the

17   facts and he knows it.  And I want to try the

18   case on the facts.  That's all I ever wanted to

19   do was try the case on the facts.

20         THE COURT:  This is argument, and each

21   attorney has the opportunity to make comments on

22   the evidence.  It's for the jury to decide what

23   the facts are.

24         MR. STEINBERG:  He knows I can't win

25   this case on emotion.  He wants to appeal to your

1    emotions, and I'm asking you not to let your

2    emotions get the best of you in this case,

3    because if you do, if you get angry like I do,

4    then you don't follow the law, because I can't

5    compete with that.  There's no way.

6              I still get angry when I hear him talk

7    about, geez, these blood/alcohols are totally

8    unreliable, you shouldn't consider them.  And I sit

9    here and I wait a second.  Tell them why you guys

10   didn't get a blood/alcohol.  Tell the jury why you

11   didn't get a blood/alcohol draw from my client that

12   night so that we would know the truth because we

13   didn't have the ability to do that.  Tell them why

14   didn't it get done.  Was it because Detective Vigil

15   was investigating his first murder case and didn't

16   think about it?  Was it because they thought that

17   Troy Kelly was going to die and it didn't matter?

18   Was it because they were more worried about their own

19   officers and making sure they got blood draws from

20   every one of their officers to make sure that that

21   was covered?

22             And then they come into a court of law

23   on a first degree murder case, and they say the

24   defense is using stuff that they know is not

25   scientifically reliable and is worthless to you.  And

1      I say to them, who put us in a position like this?

2      Who was unfair to us?  How are we able to present the

3      truth to this jury when they didn't do their

4      homework, when they didn't do their investigation?

5                     And then they come in and we're left

6      with a situation -- the situation we're left with.

7      We come to you with the evidence that we have.

8      Again, I repeat myself, who was in the position to

9      make sure this case was investigated fairly,

10     appropriately, and professionally?  Who was there

11     that could have taken the blood draw, that could have

12     been the compelling peace of evidence that you need

13     to decide this case?  Who gets the benefit of the

14     doubt?  That's what this law is about, reasonable

15     doubt.  Why are we in this position?  Who put us

16     here?  Who put us here?  They did by their

17     investigation, and their investigation at most was

18     minimal.

19                     And let me suggest why a couple of

20     things have to stand out.  I don't know if you

21     recall, but Officer Cloyd testified.  She was the

22     officer from Arapahoe County who was the crime scene

23     investigator.  She came in, and she missed a couple

24     of important things.  One, she missed the drugs, and

25     deal -- do with that situation as you would like, but

1   she also missed the box that the knife was in.  And I

2   asked her a couple of times, well, would you have

3   seized it if you had seen it?  And her response was,

4   "Well, I don't know.  I'm not sure."  Now, give me a

5   break.  Obviously, that was an important piece of

6   evidence, a piece of evidence that Mr. Hower thought

7   important enough to emphasize.  She's on the stand,

8   and not only did she miss it, and according to

9   Mr. Hower, somebody found it in a kitchen cabinet or

10  kitchen drawer, but yet the Englewood -- I'm sorry,

11  the Arapahoe County sheriffs whose job and

12  responsibility it was to look for the evidence, to

13  make sure a complete and thorough investigation is

14  done, not only did they miss it completely, then she

15  comes in and says, "I don't know if I would have

16  taken it anyway."

17              Well, what's going on here?  What is

18  the evidence in this case that you have to decide?

19  Well, let's look at a couple of things.  One, from

20  the get-go in this case, from the first time I ever

21  addressed this jury panel, from the first time you

22  walked into the room, I told you up front that my

23  client caused the death of Patricia Green.  I never

24  misled you.  I never sought to mislead you.  I told

25  you that from day one.

1        I asked you to consider as a possible

2   defense his intoxication.  Every one of you that's on

3   this jury agreed that that was something you wanted

4   to hear and that you thought was important.  Is there

5   any question in your mind that the defendant was

6   intoxicated at the time of this event?

7        One, clearly the pictures in the room

8   suggest that he was on a drinking frenzy.  Remember

9   the pictures of the empty vodka bottles.  Two, the

10  fact that he had announced to those who loved him, to

11  those who were near him that his intent was to

12  literally drink himself to death.  And how do you

13  know that?  Well, you know that because not on one

14  occasion, but on two separate occasions on July 5th

15  and on July 7th, once his grandmother and once his

16  brother call authorities and they say, "We're

17  concerned about his welfare.  We can't get him to

18  answer the phone.  We can't talk to him.  Would you

19  please go check on him?"  Both times the police go.

20  On the 5th, if you will recall, they literally can't

21  even get him out of bed.  When his brother, Brady

22  Kelly, goes to see him, he tells you he literally has

23  to hold him because he's falling down.  That's how

24  drunk he is.

25        What's all this about?  Is it about a

1    situation that none of us can understand or will ever

2    understand, and Troy Kelly will never understand, the

3    relationship he had with his abusive, alcoholic

4    mother who passed away, who he, quote, didn't want to

5    end up like, unquote, so on his birthday when he

6    realized she wasn't around, his birthday is June

7    22nd, decides this is it, I'm not interested in life

8    anymore.  I'm just going to lock myself in my room,

9    drink myself to death.

10                Now, I told you that I thought, and I

11   will again suggest to you, that one of the most

12   compelling pieces of evidence that you have here in

13   terms of his state of intoxication is what happens

14   when the police officers come in, and I want to

15   reemphasize that.  You will recall the following, the

16   officers tell you that they shot him from four to six

17   feet, literally, point-blank range.  Six different

18   bullets enter his body.  He doesn't say one thing.

19   He doesn't moan.  He doesn't groan.  He doesn't sigh.

20   He doesn't do anything.

21                Now, you may be able to control, as

22   Dr. Wingeleth talked about, certain physical

23   reactions.  You can do it.  But when you're -- when

24   you're an accomplished or experienced drunk, but you

25   can't compensate for the mental.  Isn't that the best

1   test here?  Point-blank range.  And I think it was

2   Dr. Dobersen that I asked, because I remember he said

3   to me "I've never been shot," but I remember asking

4   him, "Would you expect, Doctor, that if somebody was

5   shot, they would shout out, they would say something,

6   they would moan, they would groan, just a reaction,

7   like when you hit your hand on a door, when you hit

8   your elbow?"  It's just automatic, unless your mind

9   is not there.  And what better evidence do you want

10  than that?  Is there any question that this man was

11  completely gone, that his mind was not there when, in

12  fact, he doesn't even sigh?  He simply rolls over.

13              And Mr. Hower -- they changed.  Let me

14  tell you one of the interesting dynamics of the

15  trial.  They tell you that you ought to be able to

16  make a closing that's identical to your opening.

17  What that means is that what you say in opening is

18  what you expect the evidence to show you, and then

19  when you do your closing, you simply say, hey, I told

20  you this in opening.  Well, let's revisit for a

21  moment the prosecution's opening because they had a

22  change in mid-trial.

23              Here's what happened.  When Mr. Hower

24  opened, he told you that Trystan and his mother had

25  come home only to grab swimming stuff and was only in

1    the apartment for a short period of time because the

2    plan was they were going to leave the apartment, go

3    swimming at Rebecca Portus' house.  And there was one

4    point, if you will recall early on in the trial, when

5    there was this little thing babies wear around their

6    chest, I forget what it's called, it's some kind of

7    life thing, and Mr. Hower said, "See that, see that

8    in a corner?"  The witness said, "Yeah, I see that."

9    That's something used in a pool.  What it turned out,

10   evidence doesn't support it at all.  What happens, if

11   you will recall, Rebecca Portus says, "We were

12   talking about going swimming from 4:00 to 6:00 in the

13   afternoon, but then I never heard from Patricia

14   Green," and we now know that when Trystan was picked

15   up he wasn't wearing the blue sleeper that's in

16   evidence.  He was wearing shorts and a shirt.  So all

17   of a sudden the prosecution realizes their whole

18   theory that this was a situation where they went in

19   there, she grabbed something, and she was leaving to

20   go swimming didn't work because the evidence doesn't

21   support it, so we switch gears.

22                   Now, now we're saying that he did this

23   because she was done with him, she planned to leave

24   him, and it was a jealous rage that he had planned,

25   except the evidence doesn't support that either.  In

1    fact, perhaps one of the statements that he makes

2    tells you that.  July 11th, she sends an E-mail to

3    Sheila Walter.  I don't even remember, I hope you

4    remember, Ms. Walter testified here.  E-mail says

5    this, quote, "I wanted to let you know what is going

6    on at my home.  Maybe you can give me some insight or

7    advice or some type of help.  I broke up with Troy

8    two weeks ago."  This is dated July 11th.  When we

9    moved in together, we got along great.  Then he

10   decided he wanted to party and have people over every

11   night.  One day, I just got sick of it and told him

12   that I was moving out, and he needed to find a

13   roommate.  He was going to let me off the lease, and

14   I had plenty of people who wanted to help me move,

15   but I had nowhere to go.  But I had nowhere to go and

16   still have nowhere to go except back to this crappy

17   apartment with this guy I suddenly cannot get along

18   with because he is constantly drinking.  Lets his dog

19   chew everything up, crap and pee everywhere.  I hate

20   being there.  Do you by chance know anybody who needs

21   a roommate or has an extra room who wouldn't charge

22   more than $400?  He didn't want me there.  He is

23   doing my son this favor.  He doesn't want me there."

24                 Now, do you hear anything that

25   supports the suggestion of the prosecution, from her

1    own E-mail July 11th, five days before her death,

2    that he's jealous, that he wouldn't let her leave,

3    that he's constantly harping on her to stay in?  In

4    fact, what that E-mail says loudly and clearly is two

5    things, one, he doesn't want me there, he's doing

6    this for my son.

7                    What's important about that?  Because

8    it reaffirms a couple of things.  In this case, you

9    heard evidence that obviously Troy Kelly had a

10   personal love for Trystan and that he treated him as

11   his own son, and Trystan called him dad.  And two,

12   that you heard evidence from Sherry Salazar, from

13   Rebecca Portus, from her mother that, if anything,

14   what was going on here was, for whatever reason,

15   Patricia Green was confused.  She didn't know what

16   she wanted.  I'm sure that part of her wanted to move

17   out.  And I'm also sure that part of her wanted to

18   stay.  If you will remember, these were not my words

19   but Rebecca Portus' words.  When Rebecca went to

20   assist, she said, "Patricia chickened out.  I wanted

21   to get her out.  I wanted to help her move out, but

22   she chickened out."

23                    Sherry Salazar goes over there.  She

24   tells you that Patricia Green's confused.  She didn't

25   know what she wants.  She didn't know what to do.  So

1    Troy Kelly comes in and says, "Look, I don't want you

2    to be homeless.  I don't want you to be on the

3    street.  You can stay in this room."  Now, are those

4    the thoughts of an incredibly jealous individual who

5    wouldn't allow someone to move out, who if they

6    actually came to the conclusion they were going to

7    move out that he would take their lives?  Or as he

8    says, is the truth twofold, he doesn't want me there,

9    I have nowhere to go?

10                 And this idea that the credit is at

11   the basis for this whole thing, that she was so

12   confused, concerned about her credit, well, that's a

13   problem because here's the evidence, and I want to

14   argue the evidence, I don't want to argue emotion, I

15   want to argue the evidence.  There is no question

16   that the rent here was about 1125 a month.  She was

17   paying 400 a month.  He was paying 725 a month.  She

18   didn't have the ability, we know from this E-mail

19   because of her financial circumstances, to pay more

20   than $400 a month.  So where is it that she was going

21   to go?  Where is it?  She was so worried about her

22   credit because we all also know this, Troy has lost

23   his job.  He's sitting home.  He's drinking himself

24   to death.  He's not working.  Who is going to pay the

25   rent?  She can't afford to pay the rent, let alone

1    the full rent.  So common sense and logic tells you

2    that it's not about credit.  It's about Patricia

3    Green struggling in her own mind.

4                    Because I really think the evidence

5    suggested this to you, I think Patricia Green loved

6    him very much, to her fault, perhaps.  She loved him,

7    and you know she loved him because when he was in

8    jail on that D.U.I., she went and saw him every time

9    she could.  And when she couldn't see him, she would

10   write him letters.  Nothing in those letters, nothing

11   in terms of anything else says to you that he was

12   completely controlling her, that she had to do

13   whatever he suggested.  This is a situation where she

14   thought in her own mind, and she was wrong, that she

15   could help him, that she could change him, and to her

16   credit, her everlasting credit, she tried, and no

17   matter what the odds, she tried to change him, but he

18   wasn't going to change.  He made his decision.  He

19   was down his road.  His path of self-destruction had

20   been set.  And he was taking it step by step.

21                    So let's go back to that night.

22   You've got a guy who, as I've indicated, has been

23   shot six times, doesn't say or do anything.  Let's

24   take -- let's go back a little further.  The officers

25   before they shot him have different testimonies, and

1    let me tell you what I'm talking about.

2              If you will recall, Officer Arthur

3    told you that when he walked in he saw Ms. Green over

4    here in the corner, and he saw Mr. Kelly laying on

5    top of her.  Officer Thompson was different.  He said

6    that Mr. Kelly was over here and that after he heard

7    Trystan he then looked over and saw the body of

8    Ms. Green.  Now, why is that important?  It's

9    important for a couple of reasons.

10             First off, the officers obviously

11   were -- or I would suggest to you were completely

12   overwhelmed by the scene.  That picture that we have

13   seen repeatedly, that we saw during the prosecution's

14   closing, which has the gaping neck wound of Ms. Green

15   is un -- it's unbelievable.  Let's be honest with

16   each other.  It is.  When you see it for the first

17   time, your breath is taken away.

18             It turns out, which we found out

19   during cross-examination of Dr. Dobersen, that that

20   wound, although it is perhaps one of the uglier and

21   most grotesque wounds that we have seen in this

22   entire case or we'll ever see is a superficial wound,

23   but imagine the officers who come in and see this

24   situation.  Here is this child, Trystan, who is

25   yelling.  They see blood all over.  They see this

1    gaping neck wound, and then they see the defendant,

2    and they see a knife in his hand.

3                      Now, what happens next is important as

4    it goes to the assault on a peace officer, and the

5    reason it's important is the following:  One, you may

6    consider alcohol as it applies to assault on a peace

7    officer.  That's one of the things you can consider.

8    Officer Arthur sees that -- he sees the defendant on

9    top of Ms. Green, and that, if you remember, he turns

10   very slowly, and I'm speaking of Mr. Kelly.  He says

11   he turns very slowly, and it's almost as if his eyes

12   are following his head, and he appears to look toward

13   the officer.

14                      Now, Thompson has him in a complete

15   different area of the room, and he's got him right

16   next to the door.  What's important here is Thompson

17   says, "I must have shouted," and this was his

18   testimony, "20 different times, drop the knife."  I

19   don't know if you remember, he said, "I told him 20

20   times, drop the knife."

21                      Costarella who was there, and if you

22   remember, Officer Costarella came there, was handed

23   the child and was still literally, according to his

24   testimony, where in this area hears Officer Thompson

25   say three times, "Drop the knife, drop the knife,

1       drop the knife," and then the shooting takes place.

2                        Now, there was another key distinction

3       between the two officers' testimonies.  If you will

4       recall, we did a -- you may have been wondering at

5       the time why I was doing the example of the door with

6       the two officers.  Well, that's because Officer

7       Thompson tells you that he was backing out of the

8       door and made a decision to shoot.  Officer Arthur

9       tells you that they got stuck in the door, that

10      literally the two of them got stuck in the door.

11      They had nowhere to go.  And then they both shot at

12      the same time.  Or maybe one shot first.  He's not

13      sure.

14                        The reason the defendant's not guilty

15      of assault on a peace officer based on this evidence

16      is you have the alcohol in terms of his ability to

17      form the intent; you have a situation where clearly

18      the officers in terms of what they saw and what they

19      recall have had different ways; three, which I think

20      ought to be somewhat compelling to you is that the

21      emotions, and the emotions are important because

22      Officer Thompson who is the senior officer says, "I

23      shouted it 20 times," and in his mind, he may have

24      shouted it 20 times, but he obviously didn't.  When

25      he shoots, in his mind, he may have thought that he

1    was in danger, but he wasn't, and that's the

2    distinction here.  He doesn't have it right, and we

3    know he doesn't have it right based on Officer

4    Thompson's testimony, based on Officer Arthur's

5    testimony.

6                Now, if I recall right, Officer Arthur

7    had been an officer for about six months at the time

8    and had been on his own, if you will, no longer in

9    training for about three months.  So in terms of

10   looking at this particular case, you say to yourself,

11   this was a highly charged emotional scene, something

12   that these two officers wanted -- one of them

13   literally is looking and the other has never seen

14   anything like in their life.  They're overcome by the

15   situation.  There's no suggestion that Mr. Kelly at

16   any time said one word to them.  You didn't hear

17   anybody say to you Mr. Kelly said one thing.  He

18   never said a word.  Not one thing.

19               Two reasons that's important.  One, it

20   once again confirms the alcohol, and two, it confirms

21   that the officers aren't in any danger because this

22   guy is out of it mentally.  And if he's out of it

23   mentally, then the situation that he had the specific

24   intent isn't there.  They can't have it both ways.

25   They can't say that he is guilty of this offense

1    because he intended to cause injury to the officers

2    when the evidence suggests to you that there is

3    nothing that suggests that.  All he did, as I recall

4    the testimony, and your memories are what counts, is

5    the officers say that he was there and he turned.

6    Remember?  He turned and he had the knife in his

7    hand, and it was pointed up in the air.  Never

8    pointed at them.  Never in this gesture,

9    (indicating).  Always up in the air.  And then he

10   gritted his teeth.  Do you remember that?  And it was

11   the grit of the teeth, but what really caused the

12   shooting was the two officers lodged in the door not

13   able to go anywhere.  They can't back up.  They're

14   literally tight in a shoot.

15                 So this isn't a situation where

16   they're being for criticized or anything else.  This

17   is a situation where in terms of looking at this

18   evidence, in terms of your analysis, did the

19   defendant have the specific intent to do the, if you

20   will, first degree assault where that requires that

21   it was his conscious objective to put them in

22   imminent fear of bodily injury?  Or was it a

23   situation where he doesn't know what he's doing?

24   He's simply turning.  He's out of his head.  I'm not

25   suggesting the officers weren't in some danger, but

1    the question is, what's in his head?

2              Let's go one step back further.  This

3    is perhaps the most critical thing about this case.

4    Mr. Hower wants you to believe that this was a murder

5    that took place that was basically planned, and it

6    was planned, and somehow the alcohol that was

7    consumed closed the plan.  Well there were a lot of

8    things that suggest to you that can't be accurate.

9    Let's go through them.

10              What the defendant was wearing at the

11   time.  If you will recall, he was wearing one sock

12   and boxers, no shirt, nothing else.  Was that part of

13   the plan?  Two, no one has ever said that he was not

14   somebody who cared for and loved Trystan, and, in

15   fact, she confirms that implicitly when she says, "He

16   doesn't want me there.  He's doing my son this

17   favor."  What she's saying is he wanted to make sure

18   that Trystan had a place to stay because she has

19   nowhere to go.  So she's confirming that.

20              Would the defendant have done this,

21   quote, unquote, plan in front of this child?  Was he

22   in his head?  And let me tell you why this is

23   important because the distinction between first

24   degree murder and second degree murder is important.

25   I want to read those definitions for you for a

1        moment, if I could.

2                          Second degree murder is this, that the

3        defendant, in the State of Colorado, knowingly caused

4        the death of another person.  What does knowingly

5        mean?  Knowingly means a person acts knowingly with

6        respect to conduct or to a circumstance described by

7        a statute defining an offense when he is aware that

8        his conduct is of such nature or that such

9        circumstance exists.  Here is the key phrase.  A

10       person acts knowingly with respect to a result of his

11       conduct when he is aware his conduct is practically

12       certain to cause the result.  I want to read that one

13       more time.  He acts knowingly when he is aware that

14       his conduct is practically certain to cause the

15       result.

16                          So as Mr. Hower is telling you, when

17       he stabs her 12 times, does he know that his conduct

18       is practically certain to cause her death?  The

19       answer is absolutely yes, which is why he's guilty of

20       second degree murder because it's not the after

21       deliberation.

22                          And let me read to you the after

23       deliberation.  After deliberation is part of the

24       culpable mental state for murder in the first degree.

25       It means that the defendant acted not only

1    intentionally, but also that the decision to commit

2    the act has been made after the exercise of

3    reflection and judgment concerning the act.

4    Reflection and judgment concerning the act.  An act

5    committed after deliberation is never one which has

6    been committed in a hasty or impulsive manner.  A

7    reflection and judgment.

8                    Was Troy Kelly exercising reflection

9    and judgment when he brutalized and murdered Patricia

10   Green?  The event itself tells you no.  You know

11   that.  It was a brutal, unforgivable killing that

12   took place by a person who was out of his mind.  But

13   that doesn't excuse second degree murder.  Was there

14   reflection, and was there judgment?  The answer to

15   that has to be no, and you know that from a couple of

16   things.

17                   You know that from Dr. Wingeleth

18   because what are the odds that you would have four,

19   if you will, four checks in this case as to the level

20   of intoxication.  You have the blood sample at 9:38,

21   you have the two blood samples at 11:40, and you have

22   the urine.  You can figure that.  All come back to at

23   or about 8:48 in the evening, putting the defendant's

24   blood/alcohol at over a 26, 265, 273, in that general

25   area.  Now, given that fact, is he able to

1    deliberate?

2                      Now, the prosecution called

3    Mr. Levitsky, and interestingly enough, they never

4    asked him the question, so I assume the reason they

5    didn't ask him the question was because they knew the

6    answer, the question that you would have anticipated

7    being asked was, Mr. Levitsky, do you believe that

8    if, in fact, a person has the blood/alcohol above 25

9    they could deliberate?  That was never asked.  Now,

10   we know it was asked of Dr. Wingeleth, and his

11   response was, "No, he can't deliberate."  That's my

12   professional opinion.  You can't deliberate because

13   you can't exercise reflection and judgment.  So

14   that's the unrebutted testimony.  There's no question

15   that if your blood/alcohol is above 25 you cannot use

16   reflection and judgment.  You can't deliberate.

17                      That being the case, is the evidence

18   that the prosecution has put forward, does it

19   convince you beyond a reasonable doubt?  It's not my

20   burden.  Let me be clear here.  I don't have any

21   burden or suggestion, and I'm supposed to disprove

22   anything.  It's their burden, as Mr. Hower said, to

23   prove beyond a reasonable doubt that it doesn't

24   exist.

25                      Well, let's look at it.  You've got

1     all the alcohol in the house.  You've got a history

2     of him clearly deciding that he's going to drink

3     himself to death, and that's confirmed by the two

4     calls, two police, due to the welfare checks.  You

5     have a situation where he's clothed in the manner

6     that he's clothes.  It doesn't exercise someone who's

7     exercising reflection and judgment.

8                    You have the nature of the crime

9     itself, the gruesomeness of it, the way it takes

10    place, in front of the kid that no one questions that

11    he loves and calls his own.  The fact that he was

12    shot six times, doesn't move a muscle in terms of

13    saying a thing, in terms of moaning or groaning.  All

14    those corroborate the four tests that tell you his

15    blood/alcohol was above 25, not one, not two, not

16    three, but four different ones.

17                    Now, given that fact, the next

18    question, and it's the only question that I can ask

19    of you is, can you get past the emotion of the case?

20    Can you get past the fact that Troy Kelly did this in

21    front of Trystan?  Can you get past that 9-1-1 tape?

22    I can't compete with emotions because if you wanted

23    to decide this case based on emotions, then you

24    wouldn't decide it according to the law.

25                    If you will recall the scales of

1          justice, I don't know if you remember that image, but

2          we're holding -- the female's holding the two scales.

3          And if you remember, her eyes have a blindfold.  And

4          the theory there is, and what's important about that

5          is that you weigh the scales of justice, you weigh

6          the evidence, and you don't allow your emotions to

7          indicate the weight of the evidence, because then

8          it's unfair.

9                    And I would suggest it's a little

10         unfair that I don't have that blood/alcohol here to

11         give to you, but I can't change that, and I would

12         suggest it's a little unfair to appeal to your

13         emotions, but I can't change that.  But you can look

14         at this case and say, based on the facts, based on

15         the evidence, did Troy Kelly cause the death of

16         Patricia Green?  That goes without question.  I told

17         you that.

18                    Did he do it in terms of the evidence

19         that you have, the evidence that has been brought

20         forward during the course of the trial, upon

21         reflection and judgment and an act of deliberation,

22         after deliberation, after not only deliberation but

23         with intent?  Or do you have to say, look, I'm not

24         sure about that?  One of the reasons I'm not sure is

25         because we don't have that blood/alcohol, and the

1    reason we don't have that blood/alcohol is because

2    the police never got it, because reasonable doubt

3    talks about the evidence or lack of evidence.  If you

4    have a reasonable doubt because you say to yourself,

5    there sure is a lot of evidence that he was

6    intoxicated, I wish I knew from the police what the

7    blood draw would have been, but I don't, that's what

8    doubt is about.  That's called the lack of evidence,

9    and you can't blame that on us, and that's called

10   reasonable doubt.

11                    So when you go back and you take a

12   case step by step, and if you use, I hate to use

13   these words, it's going to sound trite, judgment and

14   reflection and no emotion and analyze this evidence,

15   then your verdict in terms of first degree murder has

16   to be not guilty.  He's guilty of second degree

17   murder.  I'm not going to suggest otherwise.  I've

18   never suggested anything.  I never tried to mislead

19   you.

20                    He's not guilty of first degree

21   assault in terms of officers.  He's clearly guilty of

22   the child abuse.  Don't waste your time with that.

23   That poor kid was in there, and this is going to

24   affect him the rest of his life.  All I'm asking you

25   to do is use judgment and reflection.  Look at the

1    evidence, and please be fair to us.  Thank you very

2    much.

3              THE COURT:  Thank you.

4              Mr. Rourke, any rebuttal?

5              MR. ROURKE:  Yes, please.

6              If wishes were changes, we would all

7    live in roses, and there wouldn't be children

8    crying to sleep.  Ladies and gentlemen of the

9    jury, these are Trystan Sanchez's wishes.  "Mom

10   got killed up with a sharp knife, and I don't

11   want her to be killed up anymore.  It's okay if I

12   cry because I'm sad.  Mom's not coming back

13   anymore.  I cried, my mommy.  I told Troy not to

14   kill my mommy.  He did anyway.  And when my mom

15   is done being killed up, I want to talk to her."

16   However, as you heard, ladies and gentlemen,

17   Trystan came to the horrifying realization that

18   his mother is not coming back anymore.  Trystan

19   Sanchez's life took a tragic and unimaginable

20   turn on July 16th of 2000.

21             It had been a great weekend.  He spent

22   the weekend with his father, Tony, his

23   stepmother, Sedona.  That Sunday night he was

24   dropped off at Kathy's house, his aunt Kathy.  To

25   a mother who even three-year-old Trystan had to

1    understand was happy again, she had resolved to

2    make a life for her and Trystan that was not only

3    better for her but better for him as well.  No

4    longer would the person who he knew as daddy stay

5    up partying all night, get drunk.  No longer

6    would the person he knew as daddy call his mother

7    a bitch and a cunt.  And no longer would the

8    defendant be mean to his mommy.  It's clear on

9    July 16th Trystan knew they were moving out of

10   that apartment.

11         You recall what he told Rima Perri at

12   Sungate, "My mommy's killed up.  He's at our new

13   house, but we can't stay at this new house."

14   Mommy was taking him back to the apartment that

15   night on July 16th, but he knew they would not be

16   staying there, and Trystan could not possibly

17   have understood nor could any of us the

18   conditions and the circumstances under which he

19   alone would be leaving the apartment that night.

20         When Trystan got home with his mom, the

21   defendant was there.  His mom put him in that

22   little blue sleeper, puts him on that bunk bed in

23   a room, as he describes, with toys and a bath

24   tub.  And you will recall what Trystan says to

25   Sedona.  "It happened when I was going to bed."

1    The next thing that Trystan hears is his mother

2    scream, and Patricia already bleeding runs into

3    that bedroom with the defendant closely behind

4    her with this big sharp knife.

5              At some point during this

6    conversation, Trystan tells daddy -- the person that

7    he calls daddy, the person that he used to say "I

8    love you" to, "Don't kill my mommy, and daddy did

9    anyway." As soon as Patricia runs into that room,

10   Trystan sees her pick up the phone, call 9-1-1 and

11   start moaning, "No, Troy, don't. I'm innocent.

12   Don't kill me, please, no. I'm innocent." She lets

13   out blood curdling screams during this phone call,

14   and Trystan also starts screaming. And you can hear

15   on that tape Trystan saying in the background, "Don't

16   kill my mommy," just like he told Charlene Slover.

17             The defendant then takes this same

18   knife, doubles the phone cord and slices it ensuring

19   that no help will come. No one will come to save

20   her. Trystan watches in horror as his mother is

21   trapped in that back corner being butchered by daddy.

22   Blood is being splashed all over the walls -- excuse

23   me, all over the blinds, all over the wall, right up

24   in here, the comforter on the bunk bed and on the

25   jeans, his inflatable swimming pool, toys in this

1    corner right here and his Mickey Mouse doll.   There

2    is blood on this, the foot.   His mother's blood pools

3    on the cover to one of his books, the Aristocats.

4    "Daddy scraped mommy's chin with a sharp knife and

5    made it red.   After this is over, daddy lays down on

6    the floor."

7                    Trystan is still up on the top of that

8    bunk bed, and he's trapped, nowhere to go.   No way to

9    get off that bed, looking at his mother's body in the

10   corner, and the defendant lying there with the knife

11   in his hand now dripping with blood.

12                   Moments later two men dressed in

13   uniforms burst into the apartment carrying

14   flashlights, carrying guns, yelling things, "what

15   happened here?   What's going on?"   Trystan tells

16   them.   He said, "He killed my mommy.   Daddy killed my

17   mommy."   Trystan is taken out of the room by a

18   stranger in uniform, and no sooner does he reach the

19   front door then Trystan hears gunshots, lots of

20   gunshots.   A few minutes later he sees the defendant

21   taken out of that apartment covered in blood, and to

22   the three-year-old, Trystan Sanchez, daddy is now

23   dead, too.

24                   From that moment, ladies and gentlemen

25   of the jury, you heard where Trystan went, what he

1    said from that moment.  Trystan no longer had a

2    mommy.  What he does have is the memory of what that

3    man did to her, painting from Charlene Slover, "Paint

4    dead mommy who got killed up with owies."  That's

5    what Trystan remembers.

6              And he is left with one unanswered

7    question.  Why did my mommy have to get killed up?

8    You, ladies and gentlemen of the jury, have heard the

9    answer to that question.  Patricia Green had made a

10   choice.  She had made a choice not to endure the

11   drunken rage and the drunken fits and the verbal

12   abuse and the elbows to the face from the defendant,

13   and the defendant would not accept this choice, and

14   he killed her out of rage, jealousy, and an

15   overwhelming need to control.  Patricia Green was

16   slashed to death because she was leaving him, and his

17   attempts to control her had been -- had failed.

18             Do you recall what Patricia told

19   Melody Flesher on July 14th?  "I told him I was

20   leaving, and his response was, you wouldn't leave

21   me."

22             This is not about intoxication to the

23   point where the defendant cannot act intentionally

24   and without deliberation -- after deliberation.  It

25   is not.

1          The evidence has proven to you beyond

2     a reasonable doubt, a doubt based on reason and

3     common sense, that the defendant had the opportunity

4     to think about what he was doing, and he intended to

5     kill her.

6          Mr. Steinberg asked the question, why

7     are we here?  Who put -- who put us in this position?

8     This is why we're here, and he's why we're here.  He

9     is the reason that every person in this room is here.

10    And that is not an excuse.  Alcohol did not kill

11    Patricia Green.  Troy Kelly killed Patricia Green.

12         Why didn't we get a blood/alcohol

13    result?  Now, imagine what would be said if as Troy

14    Kelly is laying there on the floor bleeding after he

15    was shot by officers, because he refused to drop the

16    knife, if E.M.T. personnel, if paramedics had been

17    held out in the hallway and said, wait a minute, you

18    can't come in here and treat him yet, we need to

19    stick a needle in his arm and take some more blood

20    from him?  Or what would have happened at the

21    hospital as doctors and nurses are trying to save his

22    life, as Detective Vigil told you, everyone was under

23    the assumption he was going to die, if Officer Mike

24    Fultineer or John Carr had said, excuse me, I need to

25    get in here and get a blood draw from a man who is

1    bleeding to death?  What would the answer have been?

2    Reason and common sense, ladies and gentlemen of the

3    jury.

4              Mr. Steinberg talks about July 5th and

5    July 7th being evidence that the defendant was trying

6    to drink himself to death, and on July 5th, the

7    officers could barely get him out of bed, but if he

8    was that drunk, and so the argument goes, he was that

9    drunk on July 16th, why no violence toward those

10   officers?  Why no violence toward Brady Kelly, when,

11   according to Brady, the defendant is so drunk that he

12   can't barely stand up?  Why this occasion?  Why

13   Patricia Green?  Why in this manner with this tool?

14   Unless that was his intent.

15             The defendant's motive, as Mr. Hower

16   talked about, the reason he acted, one of the things

17   we talked about almost three weeks ago now in your

18   selection, and in this case the defendant's motive

19   does prove intent and after deliberation, Patricia

20   Green was going to leave him, and if he couldn't have

21   her, nobody was going to.  Hollie Griggs was able to

22   leave him.  She had been able to walk away, despite

23   his threats, but she had to sneak out.  That wouldn't

24   happen again.  Even before Hollie, in fact, to Laurie

25   Griffin, she was able to leave the defendant, again,

1    when he's not home, despite the threats that you

2    wouldn't leave here alive.  Patricia Green was not so

3    lucky.

4              Think about what happens between the

5    time that Hollie Griggs leaves him and he murders

6    Patricia.  What happens in that time?  His mother

7    leaves him, something that he had absolutely no

8    control over whatsoever.  She drank herself to death.

9    The ultimate act of abandonment had severely affected

10   the defendant.  There is no question about that.  But

11   he had no control over that, and he was not going to

12   have it again.  Someone else was not going to walk

13   out of his life.  And six months later, Patricia

14   Green tried.  If they could not be together, it would

15   be the defendant on his terms.  He would say when and

16   how they could no longer be together.  But what he

17   did to Patricia Green, which Mr. Steinberg doesn't

18   comment on, is the best group of all.

19             First, recall the testimony of

20   Sergeant Tracy Thompson and Officer Jared Arthur when

21   they get into that apartment.  Officer Arthur

22   describes seeing the defendant rolled over, rolling

23   over as he was laying on the floor, rolling over in

24   one smooth motion, this knife in his hand held over

25   his shoulder, and he starts scooting toward the

1    officers using his left hand and his feet, and

2    Sergeant Thompson demonstrated that for you all.

3    It's not just the gritted teeth.  Recall what they

4    both said.  Officer Arthur, as he's staring at the

5    defendant, the defendant making eye contact with him,

6    never blinking, says he sees this knife start to come

7    back.  He takes a deep breath as if to exert some

8    kind of an effort or energy.  That's when they fire.

9    It wasn't that deep breath that we were relying on as

10   evidence of his intent.  It's his actions.  At no

11   time did Officer Arthur see any coordination problems

12   on the part of the defendant.

13                    Recall what Sergeant Thompson

14   testified about.  He described the same deep breath,

15   the same appearance of exertion of energy, then a

16   knife raised high over his shoulder.  And Sergeant

17   Thompson described it best when asked to describe

18   what were the defendant's movements like, methodical,

19   no coordination problems whatsoever.

20                    The attack on Patricia Green, ladies

21   and gentlemen of the jury, was not simply one stab

22   wound with a kitchen knife readily accessible.  The

23   evidence and the photographs show you that this was

24   not one single injury which was practically certain

25   to cause her death.  The blood trail in the apartment

 1    begins on the wall of the hallway and the blood

 2    droplets on the floor.  Those blood droplets led the

 3    officers back to that back corner in Trystan's

 4    bedroom.  Even if there were only two stab wounds,

 5    one appearing in the hallway to account for that

 6    blood, and then one in the corner, the time between

 7    the first stab wound and the second stab wound is

 8    deliberation.

 9            But you know that's not what we have

10    here.  In this case, the defendant had to chase down

11    Patricia, begin stabbing her, not once, not twice,

12    not 12 times, 17 times.  He stabbed her in the back

13    of the neck as she was moving away from him.  He

14    stabbed her on the right side of her back.  He

15    continued to chase her down into the corner of

16    Trystan's bedroom.  At this point he has -- he had an

17    opportunity to reflect as he acted, after reflection

18    and judgment.  Yet even as she's trapped in the

19    corner he stabs her on the upper chest, draws the

20    knife back, stabbing her in the upper chest again,

21    then the upper abdomen.  He draws the knife back and

22    stabs her on the left side of the chest, pushing that

23    knife into her body four to five inches.  Imagine the

24    force that it must have taken to do that.  That

25    injury severing the bundle of nerves that go to her

1        left arm rendering that arm useless.

2                    Has he deliberated yet?  He draws the

3        knife back and slices her throat.  He then draws the

4        knife back again and this time plunges the knife

5        three inches into the side of Patricia Green's neck,

6        severing the internal jugular vein.  All the while,

7        lashing at her right forearm and right hand and right

8        side, the only arm she could use to fend off this

9        vicious attack.

10                   And just for good measure, as Patricia

11       lay there dying, he cuts her once on the hip, only

12       this time no blood because Patricia's already dead.

13       And Trystan's looking over.  How much time did he

14       have to deliberate as to what he was doing, in

15       determining what his intent was and what he has

16       claimed throughout this trial and closing arguments

17       today he was so intoxicated and could not possibly

18       intend or form the intent to kill Patricia.

19                   Look not only at the number of stab

20       wounds, but look at their locations as well.  This is

21       not a case where an out-of-control drunk starts

22       wildly slashing and stabbing without any

23       consciousness, much less regard for who he's hitting

24       or where he's hitting or even if he's hitting the

25       victim.  Here, ladies and gentlemen of the jury,

1    these injuries are a crystal clear indication of what

2    the defendant's intent was.  Two stab wounds to her

3    neck, three stab wounds to her chest, one stab wound

4    to her abdomen, one to the back of her neck, one to

5    her left back.  All locations indicative of an intent

6    to kill.  These were calculated blows to critical

7    areas of her body to accomplish one goal, the death

8    of Patricia Green.

9                It's often asked in the context of a

10   sexual assault trial, how many times must a woman

11   victim say no before she is to be believed?  In this

12   case, how many times does Patricia Green have to beg

13   for her life?  How many times did Trystan have to beg

14   for his mother's life?  How many times does Patricia

15   have to say, "Stop, don't, I'm innocent"?  How many

16   times does the defendant have to be told to put the

17   knife down by the officers?  And how many times did

18   he have to plunge this knife into her body before he

19   could have deliberated and acted intentionally?  Is

20   17 times enough?  As he stabs her over and over,

21   she's begging for her life.  Trystan's begging for

22   her life.  All pleas fell on deaf ears.

23               Trystan's wish, ladies and gentlemen,

24   will not come true.  He'll live the rest of his life

25   without his biological mother.  He'll live with the

1    image of this knife slashing at his mother, the color

2    red clearly visible, and the knowledge that he sat

3    just feet away unable to help her, unable to convince

4    daddy not to stab his mother to death.

5           It's been eloquently stated that child

6    abuse leaves a footprint on the heart.  This, ladies

7    and gentlemen of the jury, is the footprint that the

8    defendant stomped onto Trystan Sanchez's heart, and

9    that will remain with him forever.

10          Ladies and gentlemen, the evidence in

11   this case has been proved, and we ask that you find

12   the defendant guilty of child abuse as to Trystan

13   Sanchez, wiretapping, assault in the first degree on

14   a peace officer for Sergeant Tracy Thompson, assault

15   in the first degree for Officer Jared Arthur, and

16   murder in the first degree for Patricia Lynn Green.

17   Thank you.

18          THE COURT:  Thank you.

19          Let me read you instruction No. 25.

20          The bailiff will shortly escort you to

21   the jury room.  Upon reaching the jury room,

22   you're to select one of your members to be the

23   foreperson of this jury.  Your foreperson will

24   preside over your deliberations and shall sign

25   whatever verdict you reach.

Appendix 5

Courtroom Debate over Proposed Jury Instructions

1    varied results.

2           And this doctor said based on his

3    review of the literature, he cited three sources,

4    that's not the case.  So I think it's just both

5    sides have given their opinions, and it's going

6    to be up to the jury to decide what to do.  So I

7    don't see any rebuttal in that area or

8    surrebuttal.

9           MR. STEINBERG:  Very well.

10          THE COURT:  All right.  So the

11   testimony is closed.  Any motions?

12          MR. STEINBERG:  I would renew our

13   previously made motions, Your Honor.

14          THE COURT:  All right.  The Court finds

15   that at the close of the evidence the defendant

16   has made a motion under Rule 29 to dismiss the

17   charges.  The Court denies the motion.  The Court

18   finds that there is sufficient evidence, both

19   direct and circumstantial, from which a jury

20   could convict the defendant to establish the

21   guilt of the defendant beyond a reasonable doubt,

22   citing People v. Bennett, People v. =Hollenberg

23   at 944 P.2d 537, and the Court will deny the

24   motion to dismiss counts one, two, and three.

25          All right.  Are the People going to ask

1       for any lesser included offenses?

2                     MR. HOWER:  No.

3                     THE COURT:  Is the defendant going to

4       ask for any lesser included offenses?

5                     MR. STEINBERG:  Yes, sir.

6                     THE COURT:  And what would those be?

7                     MR. STEINBERG:  We would ask for second

8       degree murder, heat of passion second degree

9       murder and manslaughter as to the murder cases.

10                    THE COURT:  All right.  Let me get my

11      notes.

12                    All right.  I know you're entitled to

13      second degree murder, under second degree murder,

14      that subsection that deals with heat of passion.

15      What's the evidence to support that?

16                    MR. STEINBERG:  Clearly, Judge, I think

17      the nature of the attack coupled with the cuts to

18      the defendant's neck are supportive, and I think

19      that under People v. =Shaw, any inference, any

20      inference is sufficient, so we're asking for

21      that.

22                    MR. HOWER:  Judge, our response would

23      be that there is not even the slightest inference

24      that any heat of passion experienced by Mr. Kelly

25      was caused by a serious and highly provoking act

1    of the intended victim.

2              THE COURT:  Okay.  Where is the nexus

3    there?  You've got -- you've got, what do they

4    call it, slashing wounds?  What did --

5              MR. ROURKE:  Slashing and stabbing.

6              THE COURT:  Dobersen called them

7    slashing type injuries to the neck.

8              MR. STEINBERG:  To the defendant's

9    neck.

10             THE COURT:  To the defendant's neck.

11             MR. STEINBERG:  That's correct.

12             THE COURT:  You've got that.  What's

13   the nexus for heat of passion?

14             MR. STEINBERG:  We think that's a

15   reasonable inference in terms of the nature of

16   this particular case that would allow us to have

17   that instruction, and we think that it would be

18   error for the Court not to do it.

19             THE COURT:  All right.  Second degree

20   murder is 18 --

21             MR. STEINBERG:  18-3-103.

22             THE COURT:  18-3 --

23             MR. STEINBERG:  103.

24             THE COURT:  -- 103.  You would have to

25   make an assumption that she had the knife.

1    That's speculation.

2           MR. STEINBERG:  I think it's a fair

3    inference because of the fact that his blood is

4    on the knife, and there's been no evidence in

5    terms of fingerprint evidence or anything else.

6           THE COURT:  Well, I think it's

7    reasonable to assume that that knife caused those

8    injuries.  The question is how did the knife get

9    in her hands, and that's speculation.

10          MR. STEINBERG:  I think that's a jury

11   question.  That's why I think under law we're

12   entitled to it.

13          THE COURT:  The Court agrees with the

14   district attorney's office.  You're entitled to

15   second degree murder, but there is no reasonable

16   inference of heat of passion.  They would have to

17   speculate to get to that.  There is no nexus

18   between -- I'll concede that his blood is on the

19   knife, and he's got cuts on his neck.

20   Reasonably -- a jury could reasonably infer that

21   those cuts were from that knife.

22          MR. STEINBERG:  We also have evidence

23   on a prior breakup he struck the person she --

24          THE COURT:  Another person?

25          MR. STEINBERG:  Well, yeah.  Gee, we

1     allowed a lot of 404(b) in this case.

2          MR. HOWER:  Judge --

3          THE COURT:  He doesn't have a

4     propensity for violence.  We've got one recent

5     incident.

6          MR. STEINBERG:  That's all we have with

7     her and the defendant.

8          MR. HOWER:  No indication that was a

9     weapon.  Additionally, as far as the blood on the

10    knife, if the Court recalls the testimony which

11    the jury heard, the defendant was holding the

12    knife when he was shot numerous times, and

13    basically, they got the knife out from under him,

14    as I recall, after he was shot.

15         THE COURT:  Well, I feel comfortable in

16    finding that there is no reasonable inference to

17    support a lesser included defense of second

18    degree murder heat of passion, and I've so

19    ordered.

20         Now, let's get go to manslaughter.

21    What's the elements of -- it would have to be

22    under the intentionally causes --

23         MR. STEINBERG:  No.  It's under A.

24         THE COURT:  Recklessly caused?

25         MR. STEINBERG:  Yes.

1        THE COURT:  What's the recklessness?

2        MR. STEINBERG:  Well, the recklessness

3    is the =TK-FRPBed by TKEU the definition.

4    Reckless, as I recall, is disregard of the

5    substantial risk that an assault will be ensuing,

6    and I think we're entitled to that.  They have to

7    prove the mental state, and I think the

8    definition for reckless is under =18-5-1, and it

9    reads in particular, recklessly, a person acts

10   recklessly when he consciously disregards

11   circumstantial and unjustifiable risks that a

12   result will occur or that a circumstance exists.

13   Our position is that that's a mental state.

14   That's the jury's determination.

15       MR. HOWER:  Judge, we agree he's

16   entitled to it if he wishes it.

17       THE COURT:  All right.  So we've got

18   first degree murder, second degree murder, and

19   reckless manslaughter?

20       MR. STEINBERG:  That's correct.

21       THE COURT:  All right.  Any other

22   lesser?

23       MR. STEINBERG:  I would ask -- not as

24   to the murder charge.

25       THE COURT:  All right.  Let's go to

1    first degree assault, unless you want to do

2    criminally negligent.

3         MR. STEINBERG:  We would ask for

4    criminally negligent as well.  We're asking for

5    that as well.

6         MR. HOWER:  We have no objection to

7    that.

8         THE COURT:  All right.  All right.  So

9    you've got four there, so the D.A. will have to

10   prepare first degree murder with no affirmative

11   defense.

12        MR. STEINBERG:  Well, wait.  Are you

13   ruling that there is no affirmative defense?

14   We'll get to that in a minute.  Let's just stick

15   with the charges.

16        MR. ROURKE:  Judge, I've already done

17   the instruction for murder in the first degree

18   and all of those.

19        THE COURT:  All right.  So let's talk

20   about assault in the first degree on a peace

21   officer.  The way it's charged is with intent to

22   cause serious bodily injury upon the person of

23   the peace officer.  He threatened him with a

24   deadly weapon.  All right.  The included would be

25   menacing.

1          MR. ROURKE:  Judge, I agree that

2    menacing is a lesser included of first degree

3    assault.

4          THE COURT:  Any other lesser includeds?

5    Are you asking for menacing?

6          MR. STEINBERG:  Yes.

7          THE COURT:  Also reckless endangerment.

8    What's reckless endangerment?

9          MR. STEINBERG:  18-3-208.

10          THE COURT:  Does that go after

11    menacing?

12          MR. STEINBERG:  Yes.

13          THE COURT:  What's the People's

14    position?  It looks like it's got all the

15    elements.

16          MR. ROURKE:  That's fine.

17          THE COURT:  All right.  On assault in

18    the first degree, we've got assault in the first

19    degree, menacing, and reckless endangerment.

20          All right.  How about child abuse, the

21    way it's charged, any lessers?

22          MR. STEINBERG:  I think it's charged as

23    a class one misdemeanor.

24          THE COURT:  How about wiretapping

25    prohibited?

1          MR. STEINBERG:  I thought you dismissed

2     that.  You said you were denying the motion as to

3     one, two, three.

4          THE COURT:  You never asked for four

5     and five.

6          MR. STEINBERG:  Oh, four and five, I

7     would raise that as well.

8          THE COURT:  All right.  Motion denied.

9     No evidence that it's a cordless phone.

10         MR. STEINBERG:  I'm trying to think.

11         THE COURT:  No, the picture shows a

12    =KRAEULGD phone.

13         MR. STEINBERG:  The problem with this

14    whole assumption is there is another found that

15    was found, and it is a cordless phone.

16         MR. ROURKE:  There was one found under

17    her left shoulder.

18         THE COURT:  Yeah.  All right.

19         So you've got one, two, three, four,

20    five, six, seven, eight, nine charges going to

21    the jury.  Any request for any non-included?

22         MR. STEINBERG:  No.

23         MR. HOWER:  No.

24         THE COURT:  All right.  We've got the

25    nine charges.

1             All right.  Let's go back to murder

2    one.  Murder one, the way it's charged in the

3    jury book, says without the affirmative defense

4    of, and under the statute -- what's the section

5    that deals with this?

6             MR. ROURKE:  18-1-804.

7             THE COURT:  18-1-804.

8             MR. STEINBERG:  Intoxication.

9             THE COURT:  Intoxication is a defense;

10   however, when -- when you read the =Harlan

11   case --

12            MR. STEINBERG:  Perhaps the Court can

13   explain to me the =Harlan case.

14            THE COURT:  That is cited at 8 P.3d

15   448.  And Justice Martinez tells =the Courts and

16   this opinion was decided on March 27th, 2000,

17   that 18-1-804(1) only applies to =SUB tree which

18   is non-self-induced intoxication, and therefore,

19   the Court -- I think I'm on headnote 2, says

20   =Harlan was not entitled under section 18-1-804

21   to an instruction setting forth an affirmative

22   defense of intoxication.  And we're talking about

23   first degree murder.  In that case the defense

24   was cocaine and alcohol.  He would have been

25   entitled to such an instruction only if he

1    introduced evidence suggesting that he was unable

2    to conform his conduct to the requirements of the

3    law due to intoxication that was not

4    self-induced, citing section 18-1-804(3) and (4),

5    and the =Harlan case -- in the =Harlan case, the

6    defendant did not satisfy these conditions.  And

7    the Court will so find the defendant in this case

8    has not satisfied the conditions.

9              =Harlan, quoting again from the =Harlan

10   case, presented no evidence of his intoxication,

11   that his intoxication was involuntary, and that

12   the facts of the case -- he did not argue that he

13   was unable to conform his conduct to the

14   requirements of the law.  Now, I've got that

15   underlined because we do have testimony through

16   Wingeleth as to an opinion on deliberation, but I

17   think that's a legal --

18              MR. STEINBERG:  And intent also.

19              THE COURT:  But that's a legal

20   conclusion.  He can give an opinion, but that

21   doesn't override.  His claim, instead, was that

22   he was voluntarily intoxicated, and he did not

23   intend to kill his victim or deliberate prior to

24   the killing.  Now, that's what we have in this

25   case, and that's directly on with =Harlan.

1          Therefore, states the Harlan case, the

2     defendant's claim falls squarely under section

3     18-1-804(1).

4               In that case, trial instruction 28 was

5     the affirmative defense instruction which dealt

6     with specific intent, and then for some starnge

7     reason, Justice Martinez rules that that was

8     harmless error by so instructing the jury, and

9     then it goes on to say the Court must correctly

10    instruct the jury.  And then it -- Instruction 28

11    again -- it leaves me no help as to what to do

12    with that other than it then goes on to say that

13    the trial judge, even though it instructed the

14    jury on Instruction 28 concerning the affirmative

15    defense of intoxication as it applied to specific

16    intent, that it correctly instructed the jury in

17    Instruction No. 30, and then it states

18    Instruction No. 30 -- which is a People's

19    tendered instruction -- it goes on to say after

20    discussing Instruction 30, therefore, the Harlan

21    court says, Therefore, we hold that voluntary

22    intoxication does not constitute an affirmative

23    defense, there again, talking about first degree

24    murder.  And they disapprove the DelGuide

25    (phonetic) case, which is an old case.And

1    Quintana, which was decided in December of 1998,

2    which was just before this case.

3            All right.  Mr. Steinberg.

4            MR. STEINBERG:  I don't understand what

5    that means.  It's a difficult case.  You want to tell

6    me what it means?

7            So my point is that you have two problems

8    here.  One, we do when we argue, unlike the defense

9    in Harlan, that there is evidence that this was not

10   self-induced intoxication and the defendant wasn't in

11   a position because he was so intoxicated to know what

12   he was doing, and we want to make that argument

13   clear.

14           I think that's what separates us.  The

15   attorney's in Harlan didn't make that argument, and

16   we have support on that in the record because that's

17   the only testimony.  The People's expert does not

18   dispute that, i.e., never said that at that level, he

19   could.  So I think that as young Harlan, if you do

20   it, that's harmless error, if you're wrong.  I mean,

21   the way I read that case is it's a difficult case to

22   get through because they seem to say one thing, do

23   another thing, and then say a third thing.

24           My suggestion would be that you do both

25   instructions, i.e., Instructions 28 and 30 per

1    Harlan, and that way everyone's happy.  Everyone's

2    satisfied, and it seems to me you comported with

3    Halan, so that's my suggestion, otherwise, it's very

4    difficult, I think, to make heads or tails of that

5    particular case in terms of the way it was written,

6    and it seems to be somewhat fact specific and fact

7    driven, which is a little different from the argument

8    I'm making and the evidence we have had here.

9         THE COURT:  Well, your argument was

10   rejected in the Arrono case.  That's what Martinez

11   specifically overruled when you look at specific

12   intent, and that's why we get to Instruction 30.

13        MR. STEINBERG:  Except I'm arguing for

14   admission.

15        THE COURT:  But what they say is,

16   Therefore, holding that after deliberation is a part

17   of a specific intent element of first degree murder

18   is consistent with 18-1-501.

19        MR. STEINBERG:  We consistently

20   disagree with the holding in People v. Arrono

21   where the Court of Appeals concluded that after

22   deliberation is not part of the culpable mental

23   state of first degree murder because under that

24   section -- and then it goes to 18-3-101.3 -- it

25   says it's separate in addition to the requirement

1    of culpable mental state of intentionally.

2          THE COURT:  And it says specifically that

3    murder in the first degree is committed beyond a

4    reasonable doubt perpetrator who acts both after

5    deliberation and with intent to cause the death of

6    the person, and then Martinez says we do not find

7    this reasoning persuasive, so they put it back

8    together.

9          All right.  So the Court's not going to

10   give Instruction No. 28, the affirmtive defense

11   instruction, unless the People agree.

12         MR. ROURKE:  No, we do not.  I think Harlan

13   makes it very clear that self-induced intoxication is

14   not an affirmative defense.

15         THE COURT:  All right.  Do you think

16   there's any evidence of -- what's the other word on

17   yours?

18         MR. HOWER:  Involuntary.

19         MR. ROURKE:  Involuntary.  Absolutely not.

20         THE COURT:  I think you can't say that you

21   drank so much that it becomes involuntary at some

22   point.

23         MR. ROURKE:  The definition of self-induced

24   intoxication that --

25         THE COURT:  I agree with you on that.  I

1    think Dale Wingleth would say that when you're at

2    that level, you're acting on impulse or --

3              MR. STEINBERG:  Emotion.

4              THE COURT:  Emotion, that when you take the

5    next drink, that's not voluntary.  That's not the

6    law.

7              MR. STEINBERG:  Correct.

8              THE COURT:  All right.  I don't see any

9    other evidence or reasonable inference of involuntary

10   intoxication.

11             MR. STEINBERG:  That's our basis for the

12   request.

13             THE COURT:  I understand that.

14             All ight.  So we're going to give 30.  Now,

15   clearly we usually give an instruction that you can

16   consider alcohol with intoxication as a defense to

17   first degree murder but you can't to second degree

18   murder.

19             Are you still going to ask for that

20   instruction to be given?

21             MR. ROURKE:  Yes.  I'm asking that the

22   instruction that I gave Mr. Steinberg earlier this

23   week, I think, and the one I gave the Court this

24   morning be given.  The way I read the Harlan case is

25   the reason that Justice Martinez found that the

1    instruction should be given, setting aside the

2    affirmative defense for a moment, was that the

3    instruction only told the jury that they could

4    consider self-induced intoxication as to whether the

5    defendant had the capacity to form the specific

6    intent.

7           Harlan says and Justice Martinez in Harlan

8    says that not only do we have to prove that the

9    defendant had the capacity but did, in fact, form the

10   requisite mental state.  The reason that it was

11   harmless error in that case was because the

12   instructions as a whole did inform the jury that the

13   prosecution had to, in fact, prove that Mr. Harlan

14   formed the specific intent.

15          The instruction that I've tendered --

16          THE COURT:  Why don't you put in that last

17   sentence that they did in Harlan, If you don't so

18   find, you must find him not guilty beyond a

19   reasonable doubt of first degree murder?

20          MR. ROURKE:  Because I think that's

21   included in the other instructions.  If we fail to

22   prove one or more of the elements, they have to find

23   him not guilty.

24          THE COURT:  Now, is first degree assault a

25   general intent?

1          MR. ROURKE:  Specific intent.

2          MR. STEINBERG:  It's specific, but I want

3    to go back to the instruction.

4          THE COURT:  Okay.  So when you've got your

5    last phrase on this tendered instruction, You may not

6    consider evidence of defendant's self-induced

7    intoxication to any other crime, that's not correct

8    because they can consider it with respect to first

9    degree assault.

10         MR. ROURKE:  It's in there, Judge.  It says

11   you can consider that for murder in the first degree

12   and first degree assault.

13         THE COURT:  How about menacing?

14         MR. HOWER:  That's a general intent.

15         THE COURT:  I see.  Okay.

16         MR. ROURKE:  So what I've done essentially

17   is discussed in that instruction not only that the

18   jury may consider that to determine whether or not he

19   had the capacity but it also reminds the jury that we

20   have the burden of proof showing that he did, in

21   fact, form the specific intent.  The problem raised

22   by Harlan --

23         MR. STEINBERG:  What I wanted to do was

24   change it to say, The Prosecution has the burden of

25   proving beyond a reasonable doubt both that the

1    defendant had the capacity to form the specific

2    intent in this case and in fact, formed the specific

3    intent required for the crimes.

4         THE COURT: Capacity is not a legal term.

5         MR. STEINBERG: Under Harlan, that's

6    basically what they're talking about.

7         MR. HOWER: But all --

8         THE COURT: No. That goes back to Arrono.

9         MR. STEINBERG: No. I agree with

10   Mr. Rourke's analysis that Harlan talks about the

11   fact that you have to have both, i.e., the

12   prosecution has to prove two things, one, beyond a

13   reasonable doubt he had the capacity to form specific

14   intent, and two, he did form the specific intent.

15        The other thing I don't like about this is

16   that it deletes the after deliberation requirements.

17   The way this reads now it just says you may consider

18   evidence that the Defendant's self-induced

19   intoxication in considering whether or not the

20   defendant had the capacity to form the specific

21   intent.

22        I think it should also say the capacity to

23   deliberate for first degree murder, and also, it

24   should say in the second paragraph -- and I

25   understand what I think Mr. Rourke did -- is he tried

1       to combine murder in the first degree and assault on

2       a peace officer.  The problem is they're different

3       elements in terms of mens rae.  The element for

4       assault in the first degree is only specific intent.

5                   As to murder, you have to have specific

6       intent and after deliberation.

7                   MR. ROURKE:  But we're using the phrase

8       specific intent as a specific legal definition, and

9       that's not what it is.  Any time we have to prove

10      intent, we lump those crimes together and call them

11      specific intent crimes.  The jury is instructed in

12      other places of the instructions as a whole that we

13      not only have to prove intent but also after

14      deliberation.

15                  MR. STEINBERG:  Yes, but this is the only

16      thing they get on intoxication, so why wouldn't we

17      put in here that, in fact, they have to in terms of

18      at least the first degree murder allegation prove

19      beyond a reasonable doubt both specific intent and

20      after deliberation because when you read this, it's

21      not in contradiction because it specifically says the

22      prosecution has the burden of proving beyond a

23      reasonable doubt that the defendant had, in fact,

24      formed specific intent for the crime of murder in the

25      first degree.

1         Well, that's not true.  They have to prove

2    both specific intent and after deliberation, so you

3    can't have it both ways and say, Well, pick and

4    choose.  The jury may say, Okay.  When it comes to

5    intoxication, they don't have to prove that after

6    deliberation.  I think you've got to have both of

7    them.

8         Well, look at this.

9         (Counsel approached the bench.)

10        THE COURT:  At the top it says it's the

11   same thing and down here it breaks it out again to

12   specific intent and after deliberation.

13        MR. STEINBERG:  That's clearly not the same

14   thing because that's two different things.

15        THE COURT:  But at the top it says it is.

16   Read the top sentence on that page.

17        MR. STEINBERG:  That's wrong.  I mean,

18   there's no question it's wrong, and the reason you

19   know it's wrong is when you look at the first degree

20   assault.  First degree assault always is specific

21   intent.  That's all you instruct the jury.  When it

22   comes to first degree murder, that's first -- it's

23   specific intent and after deliberation, so trust me,

24   this isn't the first time our supreme court has made

25   a mistake, and clearly the law is clear, Judge.

1          I don't think there's any question that the

2    distinguishing factor between mental state when it

3    comes to first degree assault and murder in the first

4    degree is murder in the first degree requires

5    specific intent and after deliberation.  First degree

6    assault does not.  This instruction is inaccurate.

7          MR. ROURKE: if we think about it in this

8    way, Your Honor --

9          THE COURT:  Do we have any place in this

10   opinion exactly what Instruction 30 said?

11         MR. STEINBERG:  Yes.  It's in a footnote if

12   I remember, isn't it?

13         MR. ROURKE:  It's footnote 14.  You want to

14   see it?  I'll show it to you.

15         MR. STEINBERG:  Yes.

16         THE COURT:  They have in parentheses after

17   deliberation.

18         MR. STEINBERG:  In footnote 14, which is

19   Instruction 30, they talk about both.

20         MR. ROURKE:  Do you have it?

21         MR. STEINBERG:  And they have the intent

22   stuff, too.

23         MR. ROURKE:  You know what, Judge, just to

24   be safe, I'll make that change.  I don't think that

25   it makes a big difference.

1          THE COURT:  Every time you state the words

2     "first degree murder," you have to put in parentheses

3     "after deliberation."

4          MR. ROURKE:  That's fine.

5          MR. STEINBERG:  I don't want it that way.

6     What I want to it to say is, You may consider

7     evidence of the defendant's self-induced intoxication

8     in considering whether the defendant had the capacity

9     to form specific intent and after deliberation

10    required for the crime of murder in the first degree.

11         Then, the second one should say the

12    prosecution has the burden of proving beyond a

13    reasonable doubt that the defendant, in fact, formed

14    the specific intent and after deliberation required

15    for the crime of murder in the first degree, period.

16         Then, as to assault, it should read the

17    same, but we subtract out the "after deliberation."

18    I don't think you can combine them because there is

19    different elements.

20         MR. ROURKE:  Judge, we'll do it.  The point

21    is even if the jury -- if we give the instruction as

22    tendered, the jury never gets to after deliberation

23    if they found he was so drunk he couldn't form

24    intent.  They don't get to the point.

25         MR. STEINBERG:  What if they found he was

1    not drunk enough, if you will, he was sober enough to

2    find specific intent and they never get to an after

3    deliberation?

4              THE COURT:  Put in where you'll put after

5    deliberation.  Let's go off the record.

6              (Whereupon, there was off the record

7    discussion between the Court and counsel after which

8    the following proceedings were held in open court:)

9              THE COURT:  Read it into the record.

10             MR. ROURKE:  If I can keep this one so I

11   can take it back to the office.  The instruction will

12   read, and I think Mr. Steinberg agrees --

13             THE COURT:  Well, he doesn't agree, but he

14   can live with the language.

15             MR. ROURKE:  You may consider evidence of

16   the defendant's self-induced intoxication in

17   considering whether the defendant had the capacity to

18   form the specific intent and act after deliberation

19   required for the crime of murder in the first degree

20   as required, period.  The prosecution has the burden

21   of proving beyond a reasonable doubt that the

22   defendant, in fact, formed the specific intent and

23   acted after deliberation as required for the crime of

24   murder in the first degree, period.

25             Then, You may consider the defendant's --

1    evidence of the defendant's self-induced intoxication

2    in considering whether the defendant had the capacity

3    to form the specific intent required for the crime of

4    assault in the first degree on a peace officer,

5    period.

6             The prosecution has the burden of proving

7    beyond a reasonable doubt that the defendant, in

8    fact, formed the specific intent required for the

9    crime of assault in the first degree on a peace

10   officer.

11            You may not consider evidence of the

12   defendant's self-induced intoxication to any

13   other crime that you have been asked to

14   consider -- you may not consider evidence of the

15   defendant's self-induced intoxication as to any

16   other crime that you have been asked to consider

17   or any lesser included offenses.

18            THE COURT:  All right.  Further record on

19   that?

20            MR. STEINBERG:  No, Your Honor.

21            THE COURT:  All right.  That's the

22   instruction that the Court will give.

23            MR. STEINBERG:  Over Objection.

24            THE COURT:  Over objection.  I'll call it

25   the modified Harlan 30 Instruction.

1          MR. ROURKE:  Okay.

2          THE COURT:  All right.  Any other -- you're

3    going to have your theory of the case here at?

4          MR. STEINBERG:  Can we do it Wednesday at

5    8:00?

6          THE COURT:  Because then we'll have to

7    retype it.  Let's due do it Tuesday afternoon so you

8    can reconcentrate on closings.

9          How long do you want for closings?

10         MR. STEINBERG:  45 minutes.

11         MR. HOWER:  Judge, I don't want to be

12   limited to that.  I would ask for an hour and 15 per

13   side, and you know know, I don't believe it will take

14   that long, maybe an hour ten.

15         THE COURT:  On a two-week trial that's

16   reasonable.  No longer than an hour and ten minutes

17   because I think you will have to argue your

18   interpretation of the instructions, hopefully, and

19   not just parrot back the testimony.

20         All right.  I'll see you at, what time,

21   2:30 Tuesday?

22         MR. STEINBERG:  Will the Court be ready at

23   2:30 because I have stuff --

24         THE COURT:  We're going to break.  Do you

25   have something else?

1          MR. STEINBERG:  Yes.  I was going to say

2      can we do it at 4:00?

3          THE COURT:  That's too late.  Then everyone

4      goes home, and we can't get it retyped.  Let's do

5      3:00.

6          MR. STEINBERG:  Okay.

7          THE COURT:  So 3:00.  All right.  Have a

8      good weekend, and we'll see you then.  You want

9      closings here?

10         MR. HOWER:  Yes, please.

11         MR. STEINBERG:  No.  Division 1.

12         THE COURT:  Are you going to use the

13     equipment?

14         MR. HOWER:  Yes.

15         THE COURT:  All right.  So tell Nancy that

16     we'll be closing.  We'll have to reserve.  All right.

17         We'll be in recess until I'll see the

18     attorneys Tuesday at 3:00.  The jurors will be here

19     Wednesday at 9:30.

20         (Whereupon, the Court was in evening recess

21     on the matter.)

22

23

24

25